Reversed and remanded for a new trial.

621 A.2d 536

IN RE RESOLUTION OF THE NEW JERSEY CASINO CONTROL COMMISSION CONCERNING THE ADOPTION OF AMENDMENTS TO N.J.A.C. 19:45–19:45–1.40(A) AND 19:45–1.40(B) AND ADOPTION OF N.J.A.C. 19:45–1.40(A) AND (B).

Superior Court of New Jersey
Appellate Division

Argued February 9, 1993—Decided March 12, 1993.

Before Judges R.S. COHEN, MUIR and KESTIN.

*John M. Donnelly* argued the cause for appellant Atlantic City Megabucks Trust (*Clapp & Eisenberg,* attorneys, *Mr. Donnelly* of counsel, and *Frederic S. Kessler* on the brief).

*Leonard J. DiGiacomo,* Assistant Counsel, argued the cause for respondent Casino Control Commission (*Daniel J. Carluccio,* General Counsel, attorney, *Mr. DiGiacomo* on the brief).

*Wendy Alice Way,* Deputy Attorney General, argued the cause for respondent Department of Law and Public Safety, Division of Gaming Enforcement (*Robert J. Del Tufo,* Attorney General, attorney, *Alvin G. Shpeen,* Assistant Attorney General, of counsel and *Ms. Way* on the brief).

The opinion of the court was delivered by

R.S. COHEN, J.A.D.

This appeal challenges the denial by the New Jersey Casino Control Commission (the CCC) of the petition of Atlantic City Megabucks Trust (the Trust) for amendment of a CCC regula-

tion. The proposed amendment would have permitted the casinos, which are members of the Trust, to ratably deduct, for calculation of the eight percent tax on gross revenues, either the annuity payments made by the Trust to Megabucks winners at the time those payments are made, or the cost to the Trust of funding the annuity payments at the time the cost is expended. No one has challenged the standing of the Trust to bring this appeal, and we do not find it necessary to raise the issue ourselves.[1]

"Megabucks" is a system of linking the top jackpot prize of licensed progressive slot machines located at a number of casinos, in which every coin or token placed in any slot machine connected to the system increases the amount of the progressive jackpot. The current amount of the jackpot is determined by the amount of play at all of the Megabucks machines, and is registered on a payoff display on the face of each slot machine. When the jackpot is won, each slot machine in the system resets to a specified minimum amount.

The Trust, which was created by the casinos, manages the Megabucks system on their behalf. It insures that payments are made, all in conformity with CCC regulations. *See N.J.A.C.* 19:45–1.39A. *et seq.* The regulations permit the jackpot prize to be in the form of an annuity, in which the patron "wins the right to receive cash payments at specified intervals in the future." *N.J.A.C.* 19:45–1.40B(a). Casinos finance the operations of the Trust and the funding of the jackpots by contribut-

---

[1] Similarly, no one has challenged the assumption of an adversary role in these proceedings by the Division of Gaming Enforcement. The Division was established by the Casino Control Act in the Department of Law and Public Safety. *N.J.S.A.* 5:12–55. It operates under the direction and supervision of the Attorney General. Its director is required to be an assistant attorney general. The statute does not define the work of the Division. We are not sure, however, that it necessarily includes appearing in this court to second the perfectly adequate presentation of the General Counsel of the Casino Control Commission in a dispute between the casinos and the Commission over dollars. We do not criticize the manner in which the Division's legal work is done. Its brief before us was of the highest quality.

ing to the Trust six percent of their net receipts from the Megabucks slot machines.

Currently, Megabucks payoffs are made in a manner like that adopted by the New Jersey Lottery. Twenty payments are made, the first immediately by the casino where the patron wins, and the following nineteen by the Trust at one year intervals. The Trust may arrange the deferred payments by purchasing either an annuity contract from an insurance company or a series of nineteen U.S. Treasury Zero Coupon Bonds that will mature on each anniversary of the win. We are told that the Trust currently secures the annuity payments through the purchase of bonds, and that the cost is about forty cents for every dollar of annuity payout. We have no comparable figures for the purchase of annuity contracts, but we imagine that the up-front cost also represents a fraction of the total amount to be paid out over the years.

The Trust's dispute with the CCC focuses on the meaning and effect of some of the statutes and regulations governing the extent of casino liability for the eight percent tax on gross casino revenues. *N.J.S.A.* 5:12–144. For the purpose of calculating the tax, gross revenues are defined by *N.J.S.A.* 5:12–24 to include all receipts from gaming operations, including uncollected checks, less only two items. One is a deduction for uncollectible gaming receivables. The other deduction, the one involved here, is "the total of all sums paid out as winnings to patrons."

The quoted language of *N.J.S.A.* 5:12–24 is modified by language contained in *N.J.S.A.* 5:12–45, a section defining "slot machine." From its enactment as *L.* 1977, *c.* 110, § 45, until a 1985 amendment, the statute defined the means by which a slot machine made a payoff as follows:

... deliver or entitle the person playing or operating the machine to receive cash or tokens to be exchanged for cash, whether the payoff is made automatically from the machine or in any other manner whatsoever.

After the enactment of *L.* 1985, *c.* 350, § 2, and an unrelated 1987 amendment, *N.J.S.A.* 5:12–45 defined the payoff from a slot machine as follows:

> ... deliver or entitle the person playing or operating the machine to receive cash or tokens to be exchanged for cash, or to receive merchandise or any thing of value whatsoever, whether the payoff is made automatically from the machine or in any other manner whatsoever, except that: a. no merchandise or thing of value shall be offered as part of a payoff of any slot machine unless such merchandise or thing of value has a cash equivalent of at least $5,000.00, and b. *the cash equivalent value of any merchandise or other thing of value shall not be included in the total of all sums paid out as winnings to patrons for purposes of determining gross revenues as defined by [N.J.S.A. 5:12–24].* (Emphasis added).

It is clear that the amendment permitting slot machine payoffs of merchandise or any thing of value did not focus on annuity jackpots. Instead, what the casinos wanted and got in the 1985 amendment was permission to make payoffs in automobiles, resort vacations, and the like. It is equally clear that the disallowance of the cash equivalent value of any merchandise or other thing of value, as a deduction from the gross revenues tax, was intended to serve the purpose of avoiding the imponderables of evaluation, and the inevitable disagreements that would have to be resolved by the CCC. There was no more significant reason than that. There was no appeal by the casinos challenging the validity of the no-deduction provision.

It was not until 1990 that the CCC adopted regulations permitting progressive slot machines and annuity jackpots. One of the new regulations, *N.J.A.C.* 19:45–1.40A(a), expressly applied to annuity jackpots the prohibition of *N.J.A.C.* 19:45–1.40A(b) against deduction of the cash equivalent value of payouts in merchandise or other things of value. There was no appeal from the adoption of the regulations. Instead, the Trust petitioned the CCC for amendments to permit deduction of the annuity jackpot payouts, or costs, and appealed the CCC's refusal to adopt the amendments.

We need not cite authority for the proposition that Atlantic City casino management and gambling activities are areas properly subject to intense governmental scrutiny and control

in the public interest. The nature of the enterprises, the vast amounts of money involved, and the intensity of appropriate governmental concern and control necessarily produce an intricate and interrelated fabric of laws and regulations.

An example of a resulting statutory provision is the bar to deducting the cash equivalent cost of payouts in merchandise or other things of value. *N.J.S.A.* 5:12–45. There is no fundamental principle or universal equity that produces such a bar. Its purpose is to serve the regulatory convenience of the CCC. And yet, when coupled with the permission to make merchandise payouts, which is also a rule without underlying principle or universal equity, the deduction bar is hard to see as unfair or improper. The casinos are not compelled to offer merchandise payouts for slot machine wins. It is up to them whether their own financial interests are served by doing so, after considering all of the relevant regulatory incidents. One of those incidents is the absence of a deduction for purposes of the gross revenues tax.

The heart of the disagreement between the CCC and the casinos is whether a Megabucks annuity payout is cash, as the Trust contends, or is "any merchandise or other thing of value" as the phrase is used in *N.J.S.A.* 5:12–45, and thus not entitled to a deduction. The permissible forms of payout under that section are "cash or tokens to be exchanged for cash, or ... merchandise or any thing of value." Plainly, annuity payouts are neither tokens to be exchanged for cash, which have a particular meaning in slot machine parlance, nor merchandise.

The Trust argues that annuity payouts are cash, and that they retain that character even though the payouts are spaced over a nineteen-year period. The CCC argues that entitlement to remote cash payments are not cash, that the amount of the annuity payments greatly exceeds the cost to the casinos of buying government bonds or annuity contracts, and, therefore, a deduction for the annual payments as they are made would be a deduction for costs not actually incurred or expended by the

casinos. In oral argument before us, the Trust conceded the force of the CCC argument that the casinos are not entitled to deduct the current cost of buying the bonds or the annuity contracts, because those payments are not "paid out as winnings to patrons." *N.J.S.A.* 5:12–24.

The CCC argues that the annuity payouts are necessarily "any thing of value" because they fall into no other category on the statutory list of permitted forms of slot machine payout. We agree. The annuity payouts are not outlays by the casinos. They are the result of casino outlays of six percent of Megabucks machine play, but the relationship between the two is no closer than that between a resort vacation trip and the cost for it paid by a casino. The payouts are made periodically in cash, but the cash payments are the result of earlier investment of funds by the Trust of significantly smaller amounts.

The Trust argues that the cost of bonds or annuity contract represents the discounted value of the stream of annual cash payouts. That is generally so in the case of zero coupon bonds, but much less so in the case of an annuity contract. The cost of the annuity contract embodies the predictions of the insurance company about future economic conditions and investment earnings. It represents, to a limited degree, a gamble. Most significantly, the cost to the Trust of securing the future annuity payments does not translate directly into cash payments to winning patrons by casinos, and it is only such payments on slot machine winnings that the statute permits to be deducted.

In our view, the CCC's reading of the governing statute was an accurate one. The arrangement by a third party of remote cash payouts to winning Megabucks players is simply not the payment of a cash jackpot by a casino. Therefore, the CCC's refusal to amend its regulations to permit deduction of the Trust's Megabucks annuity payments from gross revenues for

the purpose of calculating the base for the eight percent tax on gross revenues is

Affirmed.