734 A.2d 1160

THE STATE OF NEW JERSEY, AND THE CASINO REINVEST-
MENT DEVELOPMENT AUTHORITY, PLAINTIFFS–RESPON-
DENTS, v. TRUMP HOTELS & CASINO RESORTS, INC., DE-
FENDANT–APPELLANT.

Argued January 21, 1999—Decided August 2, 1999.

506

507

*John J. Barry* argued the cause for appellant (*Tompkins, McGuire, Wachenfeld & Barry,* attorneys; *Mr. Barry, Herbert J. Stern, Adam N. Saravay, Thomas F. Doherty* and *Tal S. Benschar,* on the briefs).

*Michael R. Cole* argued the cause for respondent Casino Reinvestment Development Authority (*DeCotiis, Fitzpatrick & Gluck* and *Connell Foley & Geiser,* attorneys; *Mr. Cole* and *Theodore W. Geiser,* of counsel; *Mr. Cole, Mr. Geiser* and *William Harla,* on joint brief with *Jeffrey J. Miller,* Assistant Attorney General).

*Jeffrey J. Miller,* Assistant Attorney General, for respondent The State of New Jersey (*Peter Verniero,* Attorney General of New Jersey, attorney).

*Jan Alan Brody* submitted a brief on behalf of *amici curiae,* United Senior Alliance, Senior Truth Squad, New Jersey Council of Senior Citizens, Independence Park Senior Citizens Friday Club and Michael Agnello (*Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein,* attorneys; *Mr. Brody* and *Kenneth L. Winters,* on the brief).

The opinion of the Court was delivered by

STEIN, J.

The primary issue posed by this appeal concerns the constitutionality of the investment alternative tax provision enacted as part of the 1984 amendments to the Casino Control Act (Act), *L.* 1984, *c.* 218, § 3, and codified at *N.J.S.A.* 5:12–144.1. A related issue involves the constitutionality of 1993 amendments to the Act, *L.* 1993, *c.* 159, that established a minimum charge of $2.00 per day for motor vehicles parked on property owned or leased by a licensed casino hotel, *N.J.S.A.* 5:12–173.2, and imposed a fee of $1.50 per day for the use of such parking spaces payable by the casino hotel for the use of the Casino Reinvestment Development Authority (CRDA) to be expended on eligible projects in the corridor region of Atlantic City. See *N.J.S.A.* 5:12–173.3 and .4. We sustain the constitutionality of the challenged statutory provisions.

I

A brief overview of the constitutional issue may be helpful to an understanding of the discussion to follow.

The challenged statutory provisions are alleged to violate the 1976 casino gambling constitutional amendment, *N.J. Const.* art. IV, § 7, ¶ 2 (Casino Amendment or Amendment). That amendment was approved by the voters in November 1976 and permitted the Legislature to authorize the operation of gambling casinos in Atlantic City:

> It shall be lawful for the Legislature to authorize by law the establishment and operation, under regulation and control by the State, of gambling houses or casinos within the boundaries, as heretofore established, of the city of Atlantic City, county of Atlantic, and to license and tax such operations and equipment used in connection therewith. *Any law authorizing the establishment and operation of such gambling establishments shall provide for the State revenues derived therefrom to be applied solely for the purpose of providing funding for reductions in property taxes, rental, telephone, gas, electric, and municipal utilities charges of, eligible senior citizens and disabled residents of the State, and for additional or expanded health services or benefits or transportation services or benefits to eligible senior citizens and disabled residents, in accordance with such formulae as the Legislature shall by law provide.* The type and number of such casinos or gambling houses and of the gambling games which may be conducted in any such establishment shall be determined by or pursuant to the terms of the law authorizing the establishment and operation thereof.
>
> [*N.J. Const.* art IV, § 7, ¶ 2(D) (emphasis added).]

Pursuant to the Casino Amendment, the Legislature in 1977 passed the Casino Control Act, *L.* 1977, *c.* 110. Consistent with the amendment, the Act imposed an annual eight percent tax on every casino's gross revenues, *N.J.S.A.* 5:12–144, but uniquely defined gross revenue in terms of the "take" from gaming operations, *i.e.*, the "total of all sums ... actually received by a casino licensee from gaming operations, less only the total of all sums paid out as winnings to patrons and a deduction for uncollectible gaming receivables...." *N.J.S.A.* 5:12–24. Casino operating expenses were excluded from consideration in the definition of gross revenue. Consistent with the Casino Amendment, the proceeds of that tax were to be deposited in a separate account known as the Casino Revenue Fund and used exclusively for programs benefitting eligible senior citizens and disabled residents. *N.J.S.A.* 5:12–145. The 1977 legislation also required casino licensees to make capital investments in Atlantic City and elsewhere in the State, commencing five years after the first calendar year of operation in

which a casino's annual gross revenue as above defined exceeded its cumulative investments in the State during that year. *N.J.S.A.* 5:12–144(b). The required annual investments in land and improvements, either promoting the tourist industry or in projects approved by the Casino Control Commission (Commission), were required to be in amounts not less than two percent of annual gross revenue. *N.J.S.A.* 5:12–144(b) to (d). Failure to make the required investments would subject the licensee to an annual investment alternative tax equal to two percent of gross revenue and payable to the Casino Revenue Fund. *N.J.S.A.* 5:12–144(e).

As a result of the five-year deferral of casino licensees' investment obligations under the 1977 legislation, little or no such investments by casino licensees were made during the seven years after the Act took effect. In 1984, *L.* 1984, *c.* 218, the Legislature revised the prospective investment obligations of casinos and also established the Casino Reinvestment Development Authority, *N.J.S.A.* 5:12–153, endowing the CRDA with broad powers to encourage casino licensees to make economically and socially desirable investments in Atlantic City and throughout the State. *N.J.S.A.* 5:12–160. To facilitate the CRDA's discharge of its statutory responsibilities, the Legislature provided casinos with the option of either paying an additional annual 2.5 percent investment alternative tax on gross revenues as defined by *N.J.S.A.* 5:12–24, or of investing annually 1.25 percent of such gross revenues in CRDA bonds or in investment projects approved by the CRDA. *N.J.S.A.* 5:12–144.1. We will describe in more detail the precise investment alternatives made available by the 1984 legislation later in this opinion. *Infra* at 524–26, 734 *A.*2d at 1173–74. The CRDA's 1998 Annual Report indicates that since the 1984 amendments to the Act the aggregate amount of investments made by casino licensees in Atlantic City and throughout the State as of December 31, 1998, was approximately $550 million dollars. By way of comparison, from the inception of casino gambling until December 31, 1998, the amount of State revenues received and dedicated to eligible senior and disabled citizens was approximately $3.5 billion dollars.

In addition, the Legislature amended the Act in 1993, *L.* 1993, *c.* 159, to generate funding for road improvements in the Atlantic City "corridor region" (the road network connecting the Atlantic City Expressway with the Boardwalk). *N.J.S.A.* 5:12–173.1 to .8. As noted, the Legislature established a minimum charge of $2.00 per day for casino parking spaces and required casino licensees to pay $1.50 per day for each used parking space to the CRDA. *N.J.S.A.* 5:12–173.2 to .4. Proceeds from the parking fees are to be used by the CRDA for projects "related to improving the highways, roads, infrastructure, traffic regulation and public safety" in the corridor area of Atlantic City. *N.J.S.A.* 5:12–173.4

In this litigation, as in the prior litigation instituted by Trump Hotels & Casino Resorts, Inc. (Trump) in 1997 in the United States District Court, Trump contends that the proceeds of "investments" authorized by the 1984 amendments to the Act as credits against the 2.5 percent investment alternative tax constitute "State revenues" within the meaning of that term as used in the 1976 Casino Amendment, and that accordingly such proceeds unconstitutionally have been diverted away from the eligible senior citizens and disabled residents that were intended by the Casino Amendment to be the sole beneficiaries of such "State revenues." Trump advances the same contention about the proceeds of the parking fees authorized by the 1993 legislation, contending that those proceeds also constitute "State revenues" that have been diverted from senior and disabled citizens in violation of the 1976 Casino Amendment. The federal litigation has since been dismissed. While it was pending, CRDA and the State instituted this suit seeking a declaratory judgment that the proceeds of casino investments made pursuant to the 1984 legislation and the proceeds of the 1993 parking fee legislation do not constitute "State revenues" within the meaning of the Casino Amendment. Trump seeks a declaratory judgment that the use of such proceeds in accordance with the 1984 and 1993 amendments to the Act violates the Casino Amendment.

Although the events that apparently prompted Trump's institution of the federal litigation are irrelevant to our resolution of the constitutional issue, in the interest of completeness we include the Law Division's explanation of the events leading up to this litigation:

The litigation arises in the context of a dispute between Trump and plaintiffs over actions taken in connection with the development of a major new casino hotel project in Atlantic City by Mirage Resorts Incorporated ("Mirage"). At present, two casinos—Trump's Castle and Harrah's—operate in the northern, bayside section of Atlantic City, known as the Marina District. Immediately to the west of Trump's Castle sits a 178–acre parcel of land ("H–Tract"), most of which is owned by Atlantic City. That parcel, part of which was formerly a solid waste landfill, offers a prime location for multi-casino development. In order to make the H–Tract suitable for multi-casino development, however, at least two significant problems must be addressed. First, the H–Tract, as a former municipal solid waste landfill, is in need of environmental remediation. Second, the current city streets linking the Marina District to the Atlantic City Expressway are inadequate to handle the increase in traffic that new development would bring. A direct highway link between the Expressway and the Marina District would be required.

On May 3, 1996, following receipt of competitive proposals for development of the H–Tract, Atlantic City entered into an agreement ("the Development Agreement") with Mirage, a Trump competitor, in which Mirage agreed to develop a multi-casino complex on the H–Tract. As part of that contract, Mirage agreed to assume full responsibility for remediating any environmental contamination at the site. Upon completion of the remediation and the opening of business on the site, part of Mirage's remediation costs may be reimbursable under the Remediation Act.

In addition, pursuant to the Development Agreement, Mirage's obligation to take title to and develop the H–Tract is contingent on the State agreeing to construct an adequate highway connecting the Marina District to the Atlantic City Expressway. To that end, the State signed a contract with Mirage on January 10, 1997, in which the parties agreed to construct "the Westside connector," a 2.2 mile highway linking the Marina District to the Expressway. Although it would appear that all businesses in the Marina District and the neighboring City of Brigantine will benefit from the construction of the Westside connector, Mirage has agreed to offset a significant part of the costs of constructing this public road through a contribution of $55 million in cash for the road project. Additional financing will come from the South Jersey Transportation Authority ("SJTA") which will issue bonds collateralized, in part, by $55 million in CRDA approved investment tax credits under the Casino Reinvestment Act and revenues from parking fees to be collected under the Parking Fee Act once the new casino hotels are operating.

The plan was challenged by Trump through a complaint filed in the United States District Court. In that action Trump asserted:

Defendants have agreed and resolved to violate Art. IV, § 7, ¶ 2 of the New Jersey Constitution—which strictly limits the use of revenues derived from the establishment and operation of casinos solely to the reduction of certain charges,

and increase in certain benefits, to senior and disabled citizens of New Jersey....

 a. By using sales tax revenues from casino hotels to be built on the H–Tract to reimburse Mirage, pursuant to the Remediation Act, for up to 75 percent of the costs of its environmental cleanup of the H–Tract;

 b. By using State revenues from casino parking fees and from casino investment alternative tax obligations to repay and collateralize bonds issued by SJTA to fund the design and construction of the Westside connector.

[*State v. Trump Hotels & Casino,* 314 *N.J.Super.* 651, 655–56, 715 *A.*2d 1052 (Law Div.1997).]

The Law Division rejected the constitutional challenges asserted by Trump. *Id.* at 678–79, 715 *A.*2d 1052. The Appellate Division affirmed, 314 *N.J.Super.* 536, 715 *A.*2d 994 (1998), substantially for the reasons expressed by Judge Williams in the Law Division. *Id.* at 539, 715 *A.*2d 1052. Trump appeals to this Court as of right. *R.* 2:2–1(a).

## II

To the extent that the legislative history of the Casino Amendment may bear on the resolution of the issues before us, we shall take advantage of Judge Williams's extensive description of portions of that history in his opinion for the Law Division:

That analysis must begin with a review of the legislative history of the amendment. On January 19, 1976 Assembly Concurrent Resolution No. 126 was introduced by Assemblymen Perskie and Kupperman from Atlantic County. The measure proposed amending the Constitution of the State [of] New Jersey to allow for casino gambling in Atlantic City. The casino amendment proposal represented an attempt to deal with the serious deterioration of Atlantic City. At one point, Atlantic City's access[i]bility and central location in the heavily populated metropolitan corridor combined to make the city one of the major convention centers and seaside resorts in the United States. However, the city failed to maintain this prominence. By 1970, the city showed signs of serious decline. The population had decreased significantly, the unemployment rate was high, housing required replacement or rehabilitation, and the number of hotel rooms had substantially decreased. *See* Barbara P. Lampen, *The Role of Legalized Gaming in New Jersey as a Stimulus for Tourism and Urban Redevelopment: A Regulator's Viewpoint,* 6 *Seton Hall Legis. J.* 55 (1982).

The public hearing on ACR–126 by the Assembly State Government and Federal and Interstate Relations Committee elicited extensive testimony on the conditions in Atlantic City and the reasons for seeking constitutional authorization of casino gambling. A sampling of this testimony is set forth below.

● [R]ecent employment figures indicate that the unemployment rolls now claim ... 37 percent of a once proud host town. Since 1970, we have experienced a loss of more than 15 major hotels, motels and restaurants which employed in excess of 3,500 employees. In a four-year period mercantile licenses have declined from 3,568 to 2,986—a barometric indicator of what is happening to our business community—or a loss of 582 mercantile licenses and another additional loss in employment approximating 4,100 people.... Welfare [rolls] have swelled to an all-time high and the people of this state are paying for that. Due to business failures and an inability to pay, our uncollected taxes in Atlantic City alone are at a high of $6,846,922. As a matter of interest, we are currently budgeting $4 million for uncollected taxes in 1976. In 1975 we were only able to collect 82 percent of our total taxes.... Coupled with this fact is an increase in our tax rate of 57 percent in four years due to a decline in ratables.... Pure and simple, we are on an expressway to disaster and we will become a ward of the state. It is well known that we are no longer able to accommodate many of the larger national conventions, our very lifeblood. We are trying to support 50,000 people on a ten week economy and this ... is impossible. We no longer attract the much needed investment to rejuvenate our tired city. We have to expand to a 52 week economy.

[Thomas Coggins, President of the Greater Mainland Chamber of Commerce. *Public Hearing before Assembly State Government and Federal and Interstate Relations Committee on ACR–126,* April 14, 1976, at 16A.]

● As one city decays, such as what is happening in Atlantic City, it spreads like cancer into surrounding areas and the reverse is true of a healthy city. We revitalize Atlantic City; we help the entire state. We have lost over 400 properties in Atlantic City, forcing the citizenry to pay a higher tax rate. Casino gambling could help replace those empty lots with good tax-paying property. Atlantic City is ... desperately in need of boosting our tourist industry.

[Pierre Hollingsworth, Commissioner, City of Atlantic City. *Id.* at 35.]

● You will hear city officials here who will explain to you that we have an 80 percent collection rate on property taxes—which property tax is approaching a $9 rate. You will hear that we have some 20-25 percent of the land in Atlantic City no longer on the tax rolls. You will hear from ... officials of the Housing Authority who have been trying to market a large tract of land that [it] is difficult, if not impossible, to attract the investment capital to build in Atlantic City. You will hear from some of the merchants and some of the working people, the labor people in the Atlantic City community who will say that without this kind of proposal they have no resources with which to attract the kind of investment capital that will give us again the type of full-based tourist economy upon which the people of Atlantic City can build.... We have to have [casinos] if we are to continue to survive as a viable economic force, as part of this State, as the linchpin of the second largest industry in this State which is the tourist industry. We cannot do it alone. We ask nothing of the people of the State of New Jersey by way of dollars and cents. We ask only that they authorize this proposal to allow us to pull ourselves up and to invest in our own community and to attract the kind of capital that will enable us to accomplish that.

[Assemblyman Steven Perskie, Prime Sponsor of Assembly Resolution No. 126. *Id.* at 3.]

• Here is a chance for the State to take one of its cities, which is having a problem ... and without the expenditure of a dime, without any funds being appropriated from the budget, without any other part of the budget being cut to put funds into Atlantic City, with the passage of this law we can bring an entire area back to where it should be, and not only bring the area back to where it should be, and bring it out of the red and into the black, but we can derive a benefit to the entire State of New Jersey. I think most of the people who will testify here today will talk about the benefit to Atlantic City. I don't think that can be emphasized enough.

[Assemblyman Howard Kupperman, Second Prime Sponsor of ACR–126. *Id.* at 7.]

• [T]he one that is nationally and internationally recognized is Atlantic City. It is a Mecca, just as, let's say, Las Vegas is. . . . Recall, if you will, it took Las Vegas 35 years to get to the stage they are today. This did not occur overnight, and even should this pass, should Atlantic City get gambling, we do not anticipate an immediate resurgence of Atlantic City. It is going to be an incentive, a keystone, to attract capitalization to a resort, and attempt to rebuild it.

[Senator Joseph McGahn. *Id.* at 12.]

• We are talking specifically about the legalization of casino gambling in Atlantic City for a specific purpose, and that specific purpose is the revitalization of the tourist industry in Atlantic City. And that is what we think we need, and that is what this bill is geared at.

[Charles Worthington, County Executive of Atlantic County. *Id.* at 17.]

The legislative history, which is replete with references to the problems facing Atlantic City, indicates that the revitalization of Atlantic City was a primary concern of those supporting the constitutional amendment. It was envisioned that this revitalization would come in the form of a rejuvenated tourist industry, increased employment, capital investment, and much needed urban redevelopment. It is instructive to note that one of the prime advocates for adoption of the amendment, was a group calling itself the Committee to Rebuild Atlantic City. *Young v. Byrne,* 144 *N.J.Super.* 10, 15, 364 *A.*2d 47 (Law Div.1976).

A second purpose to be achieved by the amendment was to raise revenue to benefit senior and disabled citizens. How this revenue would be raised was addressed by co-sponsors of the casino amendment during the public hearing before the Assembly State Government and Federal and Interstate Relations Committee on ACR–126. Assemblyman Kupperman noted, "There will be profits derived from casino gambling, not only for Atlantic City, but for the State. The State will have a take from the very top, and this money very specifically is set forth." *Public Hearing before Assembly State Government and Federal and Interstate Relations Committee on ACR–126,* April 14, 1976, at 6.

Senator McGahn, co-sponsor of the identical Senate version of ACR–126, in response to a question regarding anticipated casino revenues, made reference to a

feasibility study conducted by Depodwin Associates, Inc. *Id.* at 9. That study, entitled *Feasibility of Casino Gaming for New Jersey*, which was available to members of the committee, was conducted, among other things, "to assess the merits of adding casino gaming as a source of revenue for New Jersey...." *Id.* at 2. Significantly, the Depodwin study, which evaluated various forms of taxation used in several major countries that had legalized gambling casinos, concluded, "Our proposed choice is a straight tax on the winnings of the casino." *Id.* at 19. This tax was chosen because it provided a simple, inexpensive means of collection. The study found, "The most popular form of taxation is a tax on the gross revenues from casino gaming obtained from operators, *i.e.*, the winnings of the house. Use of this base avoids detailed calculations of deductions and subsequent audits." *Id.* at 19. The conclusions of the study were later reflected in the testimony of Assemblyman Steven Perskie at a public hearing before the Assembly State Government and Federal and Interstate Relations Committee on the Casino Control Act. The Assemblyman proposed a straight tax on gross revenues from gambling and commented, "Before arriving at the figure of 8 percent, we looked at some of the tax structures that exist in other jurisdictions and we tried to make a simplistic tax structure that would be a little easier to administer...." *Public Hearing before Assembly State Government and Federal and Interstate Relations Committee on A-2366,* December 15, 1976, at 8.

A similar focus on the State deriving its dedicated revenue from gambling activities was expressed by Charles W. Davis, Executive Vice President of the New Jersey Hotel–Motel Association, which commissioned the Depodwin study. He stated, "ACR–126 must be looked upon with favor, since the **revenue derived from legalized gambling** will be dedicated to our senior citizens." *Public Hearing before Assembly State Government and Federal and Interstate Relations Committee on ACR–126,* April 14, 1976, at 35A (emphasis added). While testimony concerning revenues to be devoted to senior and disabled citizens was less extensive than that related to Atlantic City's redevelopment, nevertheless every witness who dealt with the subject focused on revenues derived from gambling itself as the source for state taxation. That such an understanding was commonplace prior to the vote on the referendum is further evidenced in *Young v. Byrne,* 144 *N.J.Super.* 10, 364 *A.*2d 47 (Law Div.1976). The court, in dealing with declaratory judgment actions brought to determine the constitutionality of ACR–126, observed, "ACR–126 specifically earmarks the gambling revenues to a special fund for senior citizens and disabled residents of New Jersey." *Id.* at 19, 364 *A.*2d 47. All of the pre-referendum comments focus solely on revenues derived from gambling activities as the source of dedicated funds for senior and disabled citizens.

Legislative action immediately after passage of the referendum is consistent in reaffirming and reinforcing the pre-referendum understanding. Following the passage of the casino amendment in November 1976, the same Legislature moved promptly to consider the enabling legislation. On November 22, 1976, Assembly Bill No. 2366, known as the Casino Control Act, was introduced by Assemblymen Perskie and Kupperman. Six weeks following the passage of the casino amendment, on December 15, 1976, the Assembly State Government and Federal and Interstate Relations Committee held a public hearing to consider testimony on the bill. Further evidence of the intent and purpose of the casino gambling amend-

ment can be gleaned from both the testimony at hearings as well as from the text of the legislation itself.

Perhaps nowhere is the legislative intent of the casino amendment, with respect to the redevelopment of Atlantic City, more clearly articulated than in the actual text of the Casino Control Act of 1977. [*N.J.S.A.*] 5:12–1. The Legislature declared that legalized casino gambling was approved by the citizens of New Jersey as a **unique tool of urban redevelopment** for Atlantic City. *N.J.S.A.* 5:12–1(b)(4). The Legislature further noted:

> [T]he introduction of a limited number of casino rooms in major hotel convention complexes, permitted as an additional element in the hospitality industry of Atlantic City, **will facilitate the redevelopment of existing blighted areas and the refurbishing and expansion of existing hotel, convention, tourist, and entertainment facilities;** encourage the replacement of lost hospitality-oriented facilities; provide for judicious use of open space for leisure time and recreational activities; and attract new investment capital to New Jersey in general and to Atlantic City in particular.

> [*Id.* (emphasis added).]

That the Legislature viewed casino gambling as a means toward redevelopment rather than simply as a revenue raising measure or as an end in itself was clearly evidenced in the Casino Control Act which provided:

> Restricting the issuance of casino licenses to major hotel and convention facilities is designed to assure that the existing nature and tone of the hospitality industry in New Jersey and in Atlantic City is preserved, and that the casino rooms licensed pursuant to the provisions of this act are always offered and maintained as an integral element of such hospitality facilities, rather than as the industry unto themselves that they have become in other jurisdictions.

> [*N.J.S.A.* 5:12–1(b)(5).]

This is consistent with the testimony of Senator McGahn in the public hearing on the casino amendment. He commented, "Now, nationwide today there are any number of states that are exploring gambling by the State as a means of increasing revenue. We do not consider this, to be perfectly honest with you, as primarily a revenue producing measure." *Public Hearing before Assembly State Government and Federal and Interstate Relations Committee on ACR–126,* April 14, 1976, at 29A.

The redevelopment theme was manifest in the statutory scheme adopted by the Legislature. One of the early redevelopment strategies employed by the Legislature focused on the development and upgrading of the inventory of hotel rooms in Atlantic City. The Legislature mandated that no casino hotel could be licensed unless it contained at least 500 sleeping units meeting certain minimum statutory standards. *N.J.S.A.* 5:12–27, –83. Another strategy adopted by the Legislature required a licensee to make capital investments in approved projects or face the prospect of an additional tax. *N.J.S.A.* 5:12–144(b) [to] (e). Specifically, a licensee, whose gross revenues exceeded the cumulative investments in the State during a particular year, was obligated to make additional investments of at least 2 percent of their gross revenues. *N.J.S.A.* 5:12–144(b). Failure to make such investment within five years would subject the licensee to an investment alternative tax in an

amount equivalent to 2 percent of the gross revenue. The Legislature contemplated that these investments would be used for the following:

> [T]he improvement, furtherance, and promotion of the tourist industry in this State through the planning, acquisition, construction, improvement, maintenance and operation of recreational, entertainment, and other facilities for the public, including, without limitation a performing arts center, the beaches and shorefront of this State, and transportation facilities providing or enhancing service in resort areas of this State, or ... the improvement, furtherance, and promotion of the health and well-being of the people of the State through the planning, acquisition, construction, improvement, maintenance, and operation of a facility, project or program approved by the commission.

> [*N.J.S.A.* 5:12–144(d).]

The proposed Casino Control Act explicitly addressed the goal of providing economic assistance to senior and disabled citizens. The Act provided for an 8 percent tax on gross revenue which was to be dedicated to eligible senior citizens and disabled residents. *N.J.S.A.* 5:12–144(a) and 5:12–145. The 8 percent tax was to be derived solely from "gaming operations." *N.J.S.A.* 5:12–24. It was clear, however, that casino hotels would be responsible to pay other taxes levied against businesses in New Jersey as well. This conclusion finds support in the testimony of the measure's supporters and critics alike.

Assemblyman Perskie, in discussing why an 8 percent tax was preferable over a 12 percent tax, noted:

> As I understand it, the Governor has commissioned some individuals in the Department of Treasury to focus on this whole [tax] structure. Before arriving at the figure of 8 percent, we looked at some of the tax structures that exist in other jurisdictions and we tried to make a simplistic tax structure that would be a little easier to administer, for example, than Nevada that has a county, local and a state tax, a set of table fees and what not. We also tried to provide a sufficiently sizable figure that would generate substantial revenue for the constitutionally-dedicated purpose, yet also keep in mind the economic realities of the casino industry.... So the direct answer to your question is I think that the 8 percent is a realistic figure. If it can be shown that 12 is a realistic figure, considering all of the criteria I have just articulated, I could support it. But I rather suspect, upon investigation, you will find, structuring the tax, as it is, on gross revenues as opposed to net revenues, and **providing in any event that the casino operators are going to be paying the corporate business tax in New Jersey or the personal income tax, whichever is applicable, and the property taxes and all of the other taxes that we have, that this is a realistic figure.**

> [*Public Hearing before Assembly State Government and Federal and Interstate Relations Committee on Assembly Bill No. 2366,* December 15, 1976, at 8[ ] (emphasis added)[.]]

Even the opponents of gambling did not question that the Legislature could impose taxes or collect fees which would not be dedicated to seniors and the disabled. Dr. Samuel Jeanes, a leading opponent of gambling, commented:

> Now, if the entire 8 percent promised to our disabled and senior citizens is not paid to them, I believe our lawmakers will have broken faith with these citizens

who have served our State so well. This was a promise and that promise ought to be kept. These gambling casinos are privately owned and privately operated, and there is no reason why the State should pay one penny of the taxpayer's money to assist their operation. **So we would recommend that the 8 percent tax on gross revenues of the casinos be allocated entirely for senior and disabled citizens as was promised and that an additional tax,** not less than that now being paid by the racetracks of New Jersey, **be levied on the gross revenue of the casinos to pay the cost of the administration of this act.**

> [*Public Hearing before Assembly State Government and Federal and Interstate Relations Committee on Assembly Bill No. 2366,* December 15, 1976 at 73[ ] (emphasis added).]

It appears that in 1976 both supporters and opponents of gambling alike understood that the constitutionally dedicated funds would come only from this 8 percent tax on gross gambling revenues and that additional taxes or charges on other aspects of casino hotel operations were not required to be dedicated to support for seniors and the disabled.

In addition to the 8 percent tax on gross revenues, the Casino Control Act imposed a fee for the issuance or renewal of a casino license, *N.J.S.A.* 5:12–139, and a licensing fee on slot machines, *N.J.S.A.* 5:12–140. The revenues from these fees were to be deposited in the Casino Control Fund for the operating expenses of the Casino Control Commission and the Division of Gaming Enforcement. *N.J.S.A.* 5:12–143. Furthermore, the Act required payment of the corporate business tax, *N.J.S.A.* 5:12–148(b), and casino licensees were also required to pay unemployment compensation taxes to the State. *N.J.S.A.* 43:21–7.

The common understanding at that time was later reflected in a 1982 article, *Casino Gambling: The Elements of Effective Control, 6 Seton Hall Legis[.] J.* 55 (1982), by R. Benjamin Cohen, former General Counsel and Director of the Legal Division of the Casino Control Commission. In discussing both the casino amendment, and the Casino Control Act, Cohen noted:

> Pursuant to the authority of [the casino gaming amendment] the Legislature enacted the Casino Control Act which was signed into law on June 2, 1977, by Governor Brendan T. Byrne. This law was the culmination of legislative initiative, months of study by a Staff Policy Group on Casino Gambling designated by the Attorney General and the State Treasurer at the Governor's request, a report by the Commissioner of Investigation, and a good deal of debate and discussion in the state Legislature....
>
> **In addition to the revenues generated by increased corporate business taxes, property taxes, state and federal income taxes, sales taxes and luxury taxes, the Casino Control Act imposes an eight percent tax on the gross revenues of the casinos.** This gross revenues tax is deposited into a special account known as the Casino Revenue Fund. Moneys in this fund are appropriated exclusively for reductions in property taxes, rentals, and utilities charges of eligible senior citizens and disabled residents of New Jersey. The cost of the governmental regulation of the casino gaming industry is borne by the industry itself in the form of license fees rather than by tax dollars.
>
> [*Id.* at 3–5 (emphasis added).]

The legislative history of the Casino Amendment described in Judge Williams's opinion resolves some but not all of the questions that are collateral to our resolution of this appeal. That history demonstrates clearly that the rehabilitation of Atlantic City as a tourist and resort center was a fundamental if not the primary objective of the sponsors of the Casino Amendment and the Casino Control Act, even though the constitutional dedication of the proceeds of the tax on casino wagering for the benefit of senior and disabled citizens was a crucial element of the Amendment and the primary inducement used to solicit voter approval of the Amendment. Less clear is whether the sponsors intended that the rebirth of Atlantic City would occur simply as an indirect byproduct of the authorization of casino gambling, as Trump contends, or whether the Legislature intended and the public understood that legislatively mandated investments by the casinos were an integral part of the plan to revitalize Atlantic City. Fairly read, the legislative history of the Casino Amendment and the Casino Control Act suggests that the contemporary understanding, at the time the Casino Amendment was submitted to the voters in November 1976, was that legislatively mandated investments in Atlantic City were part and parcel of the overall legislative design. As noted, when first enacted in 1977 the Casino Control Act required all casinos whose annual gross revenue exceeded their cumulative investments in the State to make annual investments in land and real property improvements in Atlantic City and other parts of the State, commencing after five years had elapsed, equal to two percent of gross revenues. Failure to make such investments would expose the casinos to liability for an additional two percent tax on gross revenue, payable to the Casino Revenue Fund for the benefit of senior and disabled citizens. *N.J.S.A.* 5:12–144(c).

Direct evidence that the legislatively mandated investment mechanism was a matter of public record before the Casino Amendment was approved by voters is revealed by the transcript of the public hearing on the Casino Control Act. Assemblyman

Steven Perskie, the Act's sponsor and a strong proponent of the Casino Amendment, testified in part as follows:

> I think what should be in the legislation is the articulation of the kinds of commitments that we made in support of this referendum question to the people of New Jersey, and for which they voted on November 2nd. It was no accident that Assemblyman Kupperman, Senator McGahn and I, and the Committee to Rebuild Atlantic City under the chairmanship of Mayor Lazarow, quite deliberately and quite intentionally, released what is in essence this bill, on September 30, 1976. . . . There are some changes and there will be others, but it is essentially the same bill. That was no accident. We did that quite deliberately in order to make some specific kinds of commitments to the people of New Jersey.
>
> [*Public Hearing before Assembly State Government and Federal and Interstate Relations Committee on Assembly Bill No. 2366,* December 15, 1976, at 9–10.]

Accordingly, there appears to be incontestable evidence that at least the sponsors of the Act and the Casino Amendment, and in all likelihood the Legislature as a whole, understood contemporaneously with the approval of the Amendment, or very shortly thereafter, that the dedication of eight percent of gaming revenues to senior and disabled citizens was intended to coexist with a legislative mechanism designed to compel investment in Atlantic City or elsewhere by imposing on casinos that failed to make such investments an additional two percent tax on gaming revenues. Unanswered by the legislative history, but to be resolved by this Court, is the constitutionality of the mechanism included in the 1984 amendment to the Act that induces casinos to make approved annual investments equal to 1.25 percent of gross revenues by imposing as an alternative to such investments an additional 2.5 percent tax on gaming revenues payable to the Casino Revenue Fund.

The Casino Control Act's legislative history also suggests that the legislative understanding of the critical phrase "state revenues derived therefrom" contained in the Casino Amendment was that such revenues were only those to be derived from the proposed eight percent tax on the casino's winnings or "take." At the public hearing on the Casino Amendment, Assemblyman Kupperman, a co-sponsor, observed: "There will be profits derived from casino gambling, not only for Atlantic City, but for the State. *The State will have a take from the very top,* and this money very specifical-

ly is set forth." *Public Hearing before Assembly State Government on Federal and Interstate Relations Committee on ACR–126*, April 14, 1976, at 6. At the same hearing, Senator McGahn, a co-sponsor of the Senate version of the Amendment, responding to a question about estimated State revenues from casino gambling, *id.* at 9, referred to a study prepared by DePodwin Associates, Inc. entitled *Feasibility of Casino Gaming for New Jersey.* That study, conducted to "assess ... the merits of adding casino gaming as a source of revenue for New Jersey," *id.* at 2, apparently recommended a tax imposed directly on casino winnings: "Our proposed choice is a straight tax on the winnings of the casino." *Id.* at 18. The study stated: "The most popular form of taxation is a tax on the gross revenues from casino gaming obtained from operators, *i.e.*, the winnings of the house. Use of this base avoids detailed calculations of deductions and subsequent audits." *Id.* at 19.

As noted by Judge Williams, *supra* at 518–19, 734 *A.*2d at 1169–70, Assemblyman Perskie, testifying at the public hearing on the Casino Control Act, elaborated on the decision to incorporate in the legislation an eight percent, rather than a twelve percent, tax on casino winnings:

> We also tried to provide a sufficiently sizable figure that would generate substantial revenue for the constitutionally-dedicated purpose, yet also keep in mind the economic realities of the casino industry.
>
> So the direct answer to your question is I think that the 8 percent is a realistic figure. If it can be shown that 12 is a realistic figure, considering all of the criteria I have just articulated, I could support it. But I rather suspect, upon investigation, you will find, structuring the tax, as it is, on gross revenues as opposed to net revenues, and providing in any event that the casino operators are going to be paying the corporate business tax in New Jersey or the personal income tax, whichever is applicable, and the property taxes and all of the other taxes that we have, that this is a realistic figure.
>
> [*Public Hearing before Assembly State Government and Federal and Interstate Relations Committee on Assembly Bill No. 2366*, December 15, 1976, at 8.]

The clear implication of the testimony at the public hearings concerning both the Casino Amendment and the Casino Control Act is that the sponsors, and in all likelihood the Legislature, understood that the revenue contemplated for dedication to senior

and disabled citizens would be the proceeds of a tax—initially at an eight percent rate—levied on the gross winnings of casinos. In addition, the understanding was that the proceeds of other taxes paid by the casinos—corporate business taxes, property taxes, sales taxes—were not to be considered State revenue derived from "the establishment and operation of . . . gaming establishments" for purposes of the Casino Amendment's dedication of State revenue to eligible senior and disabled citizens. Informed by the legislative history, a fair reading of the critical language of the Casino Amendment suggests that its intended meaning is different from and narrower than the meaning implied by the literal language of the Amendment.

## III

Before addressing the legal issues presented by this appeal, we shall describe in greater detail the specific "investment" options that were made available to casino licensees pursuant to the 1984 amendment to the Act. We acknowledge that the parties disagree over whether the specific design of those various investment options is material to the overriding constitutional issue. Trump asserts that because the proceeds of those investments have been extracted from the casinos in the form of a credit against an additional 2.5 percent tax on gross revenues, neither the character of the investments nor the use of their proceeds is relevant: the credit itself renders the investment proceeds an unconstitutional diversion of the revenues dedicated to eligible senior and disabled citizens.

The Attorney General and the CRDA contend, however, that the credit is a lawful mechanism to encourage investments by casino licensees and that the character of the investments made by the casinos pursuant to the 1984 amendment demonstrates that their proceeds do not and could not constitute "State revenues" within the meaning of the Casino Amendment. They also rely on *N.J.S.A.* 5:12–144.1(i), which provides in part:

Any purchase by a licensee of bonds issued by or offered through the Casino Reinvestment Development Authority pursuant to sections 14 and 15 of this act

and subsection b. of this section and all approved eligible investments made by a licensee pursuant to section 25 of this act and subsection b. of this section are *to be considered investments and not taxes owed or grants to the State or any political subdivision thereof.*

[Emphasis added.]

Among the investment options for casinos pursuant to the 1984 amendments are the purchase of CRDA bonds. See *N.J.S.A.* 5:12–144.1(b). The Act requires that such bonds mature in not less than fifty years and bear interest at a rate not less than two-thirds of market rate determined on the basis of the "average rate of the Bond Buyer Weekly 25 Revenue Bond Index for bonds available for purchase during the last 26 weeks preceding the date [of issuance.]" *N.J.S.A.* 5:12–162(d). The CRDA's 1998 Annual Report states that as of December 31, 1998, the total amount of casino investments in bond issues totaled $61,489,740, and that such bonds range in maturity from thirty-five to fifty years and bear interest rates ranging between four and seven percent.

Casino licensees also may receive a two-for-one credit against the additional 2.5 percent tax on gross revenues by making investments either in projects identified as eligible by the CRDA or by making direct investments in projects approved by the CRDA on application by individual casino licensees. See *N.J.S.A.* 5:12–173 and *N.J.A.C.* 19:65–2.8. The CRDA's 1998 Annual Report states that as of December 31, 1998, the total amount of investments by licensees, including investments in CRDA projects and direct investments, was $174,040,257.

The Act also permits licensees to obtain two-for-one investment tax credits by making a "donation of money or realty to an eligible project, facility or program." *N.J.S.A.* 5:12–177. Approval for such authorized donations requires an application to the CRDA and demonstration that the project to which the donation is made satisfies the CRDA's approval criteria. See *N.J.A.C.* 19:65–2.5 and –2.9. The CRDA's 1998 Annual Report states that as of December 31, 1998, the aggregate amount of approved donations by licensees totals $141,985,518.

Of the total amount of funds, $547,537,039, paid by casino licensees to the CRDA pursuant to the investment tax credit authorized by the 1984 amendments to the Act, $170,021,524 had not been allocated by licensees as of December 31, 1998 to bonds, investments or donations.

Before a casino licensee is permitted to purchase CRDA bonds or to make investments or donations for purposes of the investment tax credit, the licensee is required to enter into a contract with the CRDA committing to the future purchase of the CRDA bonds or to the alternative of approved investments or donations. Such contracts provide that two-thirds of the interest earned by the CRDA on funds paid by licensees pursuant to the investment tax credit provisions of the 1984 amendments during the period between payment to the CRDA and the investment of the funds by the licensees shall be repaid to the licensees and the balance retained by the CRDA.

## IV

We begin our analysis of the challenge to the constitutionality of the 1984 amendments to the Casino Control Act with the recognition that Trump must sustain a heavy burden in order to succeed in its assertion of the invalidity of the challenged legislation. Our courts have demonstrated a steadfast adherence to the principle "that every possible presumption favors the validity of an act of the Legislature." *New Jersey Sports & Exposition Auth. v. McCrane*, 61 *N.J.* 1, 8, 292 *A.*2d 545 (1972). Accordingly, the exercise of the judicial power to invalidate a legislative act "has always been exercised with extreme self restraint, and with a deep awareness that the challenged enactment represents the considered action of a body composed of popularly elected representatives." *Ibid.* Consistent with that policy of restraint, we have emphasized that "a legislative act will not be declared void unless its repugnancy to the Constitution is clear beyond a reasonable doubt." *Harvey v. Essex County Bd. of Freeholders*, 30 *N.J.* 381,

388, 153 *A.*2d 10 (1959); *Gangemi v. Berry,* 25 *N.J.* 1, 10, 134 *A.*2d 1 (1957).

■ The presumption that a statute is constitutional is enhanced when that statute has been in effect and implemented without challenge over an extended period. As this Court observed in *In re Loch Arbour,* 25 *N.J.* 258, 264–65, 135 *A.*2d 663 (1957):

> [C]ourts always recognize a strong presumption of constitutionality; doubts are resolved in favor of conformity with the organic law, and if the statute under attack admits of two constructions, one of which will render it invalid and the other valid, the interpretation sustaining constitutionality will be adopted. Added force is given to these basic concepts by the further policy of our law not to invalidate a statute which has been in force without substantial challenge for many years, unless its unconstitutionality is obvious.

■ In addition to the strong presumption of validity that attaches to legislative enactments challenged on constitutional grounds, we also are guided by the principle that the constitutional provision in question must be interpreted and applied in a manner "that serves to effectuate fully and fairly its overriding purpose." *Dickinson v. Fund for Support of Free Pub. Sch.,* 95 *N.J.* 65, 95, 469 *A.*2d 1 (1983) (Handler, J., dissenting in part). "The polestar of constitutional construction is always the intent and purpose of the particular provision." *State v. Apportionment Comm'n,* 125 *N.J.* 375, 382, 593 *A.*2d 710 (1991).

■ In ascertaining the intent of a constitutional provision, a court must first look to the precise language used by the drafters. If the language is clear and unambiguous, the words used must be given their plain meaning. *Gangemi, supra,* 25 *N.J.* at 10, 134 *A.*2d 1.

> It is a familiar rule of construction that where phraseology is precise and unambiguous there is no room for judicial interpretation or for resort to extrinsic materials. The language speaks for itself, and where found in our State Constitution the language is the voice of the people.
>
> [*Vreeland v. Byrne,* 72 *N.J.* 292, 302, 370 *A.*2d 825 (1977).]

■ On the other hand, if the language of the constitutional provision is unclear or is susceptible to more than one interpreta-

tion, courts may consider sources beyond the instrument itself to ascertain its intent and purpose. As Justice Jacobs observed in *Lloyd v. Vermeulen,* 22 *N.J.* 200, 206, 125 *A.*2d 393 (1956): "[S]ince words are inexact tools at best, resort may freely be had to the pertinent constitutional and legislative history for aid in ascertaining the true sense and meaning of the language used." A statute adopted contemporaneously with the constitutional enactment in dispute may also constitute a valuable resource in determining the intent of the constitutional provision. *Atlantic City Racing Ass'n v. Attorney General,* 98 *N.J.* 535, 548, 489 *A.*2d 165 (1985).

 A. Defendant's Contention That the Casino Amendment's Dedication to Senior Citizens and the Disabled of "State Revenues Derived [ ] From the Establishment and Operation of [Casino] Gambling Establishments" is not Limited to Revenues from a Direct Tax on Gambling

 ■ We address the foregoing contention, essentially as framed by defendant Trump, even though its resolution does not resolve the question whether the proceeds of the 1984 investment alternative tax constitute "State revenues."

 Read literally, the Casino Amendment dedicates to eligible senior and disabled citizens "the State revenues derived" from the "establishment and operation of ... gambling establishments." Defendant acknowledges that that reading is too broad, conceding that the Amendment "does not dedicate the proceeds of corporate taxes, property taxes, sales taxes, or other generally applicable State revenue-raising measures." Defendant asserts that the constitutional dedication encompasses only revenues specifically related to the operation of casinos as distinguished from generally applicable revenue sources such as corporate and sales taxes. Defendant's interpretation of the Amendment also would exclude fees reasonably related to regulatory costs, but would include revenues from the investment alternative tax program and the casino parking tax.

In our view, defendant's interpretation of the Casino Amendment is pragmatic rather than literal and derives scant support from the language of the Amendment. Read literally, all State revenues derived from the operation of gambling establishments are dedicated to eligible senior and disabled citizens, including corporate and sales taxes and licensing fees. The recognition that that literal reading of the Amendment could not possibly constitute the intended meaning obviously impels defendant to favor a narrower and more practical construction.

We agree that the literal language of the Amendment supports an understanding of the term "State revenues" that is significantly broader than its intended meaning. We are persuaded, however, that the Amendment should not be read literally and that resort to its legislative history and to the history of the Act is appropriate and essential. That history plainly demonstrates that the legislative design, both for the Amendment and the Act, was that the dedicated revenue was to be derived solely from a direct tax on the casino's "take." As noted, *supra* at 522–24, 734 *A.*2d at 1172–73, the uncontradicted testimony at the public hearings antecedent to the adoption of the Casino Amendment and the Act demonstrate beyond question a legislative understanding that the "State revenue" to be dedicated to senior and disabled citizens was to be the proceeds of a tax, initially imposed at the rate of eight percent, on the annual gross winnings of casinos and that the proceeds of other taxes, such as corporate, sales and property taxes, were not to be considered as "State revenues." Without question, more precise drafting of the Casino Amendment to convey that purpose would have been preferable, but we entertain no doubt that we accurately have characterized the essential legislative intent.

Equally clear from the legislative history, and made explicit by the language of the Act (the proposed provisions of which had been made public prior to the vote on the Amendment) (*supra* at 521–22, 734 *A.*2d at 1172), was that the dedication authorized by the Casino Amendment was intended to coexist with provisions of

the Act that were designed to compel investment in Atlantic City and elsewhere in the State by levying on those casinos that failed to make such investments an additional two percent tax on gross winnings from gambling. Accordingly, we reject defendant's contention that the term "State revenues" as used in the Amendment was intended to encompass the proceeds of investments by casinos pursuant to the Act as originally enacted or pursuant to the 1984 amendments thereto.

### B. Defendant's Contention That a Tax Credit Against a Dedicated Tax is Unconstitutional

Defendant Trump asserts that even if the proceeds of the investment alternative tax constitute "investments" by the casino licensees, the mechanism used by the Legislature to encourage those investments is unconstitutional because it constitutes the impermissible grant of a tax credit against a constitutionally dedicated tax. In simple terms, defendant contends that any use of a tax credit mechanism against a constitutionally dedicated tax results in an unconstitutional diversion of funds from the dedicated revenue stream.

In support of its argument, defendant relies on a group of cases decided in other states that involved challenges to the expenditure of dedicated funds for non-dedicated purposes. *See, e.g., Opinion of the Justices,* 665 *So.*2d 1389, 1391 (Ala.1995) (holding that appropriation to other departments of state government of funds derived from motor vehicle fees, excises or licenses obviously would violate constitutional dedication of those funds to highway purposes); *V–1 Oil Co. v. Idaho Petroleum Clean Water Trust Fund,* 128 *Idaho* 890, 920 *P.*2d 909, 912–13 (holding unconstitutional one-cent-per-gallon transfer fee on petroleum products committed by statute to Petroleum Clean Water Trust Fund because statute violated constitutional dedication of gasoline taxes to maintenance of public highways), *cert. denied,* 519 *U.S.* 1009, 117 *S.Ct.* 514, 136 *L.Ed.*2d 403 (1996); *In re Opinion of the Justices,* 324 *Mass.* 746, 85 *N.E.*2d 761, 764 (1949) (holding that fees paid in

connection with registration, operation, and use of motor vehicles and constitutionally dedicated to State Highway Fund cannot be diverted to maintenance of subways, tunnels, and other structures owned and operated by Metropolitan Transit Authority); *Cory v. King,* 209 *Minn.* 431, 296 *N.W.* 506, 507–08 (1941) (holding unconstitutional statute that attempted to impose five percent charge on registration and gasoline taxes constitutionally dedicated to state highway fund for purpose of funding operations of other departments of state government); *Automobile Club of Oregon v. State,* 314 *Or.* 479, 840 *P.*2d 674, 683 (1992) (holding unconstitutional statutes imposing tax on underground oil storage and fee on motor vehicle emissions and assigning proceeds to specified environmentally constructive purposes because of conflict with constitutional dedication of such revenues for highway purposes); *Rogers v. Lane County,* 307 *Or.* 534, 771 *P.*2d 254, 259 (1989) (holding unconstitutional agreement between County and City of Eugene providing for transfer to city of state funds constitutionally dedicated for highway purposes to be used by city for airport parking lot and covered walkway); *In re Northwest Natural Gas Co. v. Frank,* 293 *Or.* 374, 648 *P.*2d 1284, 1288 (1982) (holding unconstitutional statute authorizing Oregon Department of Energy to fund operations by tax on sale of energy resources because of conflict with Oregon's constitutional dedication of oil or gas taxes to state school fund); *Associated Gen. Contractors of South Dakota, Inc. v. Schreiner,* 492 *N.W.*2d 916, 922 (S.D.1992) (holding unconstitutional annual tax credits to ethanol producers of twenty cents per gallon and aggregating $1,000,000 per year because of conflict with constitutional dedication of motor vehicle fuel tax proceeds to state highway purposes); *Automobile Club of Washington v. City of Seattle,* 55 *Wash.*2d 161, 346 *P.*2d 695, 701 (1959) (holding unconstitutional payment of tort judgment out of "city street fund" constitutionally dedicated to highway purposes).

In general, we find unpersuasive and inapposite the cases relied on by defendant. For the most part, they concern attempts by state legislatures to authorize funds actually collected from motor vehicle taxes and constitutionally dedicated to highway or other

purposes to be improperly used for non-dedicated public purposes. No such issue is presented by this appeal. A less distant but similarly unpersuasive analogy is presented by *Schreiner, supra,* 492 *N.W.*2d at 922–23, where the South Dakota legislature apparently attempted to encourage ethanol production by according producers a twenty cent per gallon credit against their motor vehicle fuel tax liability, and the South Dakota Supreme Court ruled that the credit was inconsistent with that state's dedication of fuel taxes to highway purposes. Although that court's holding appears to limit unduly the Legislature's ability to provide incentives for ethanol production, the tax liability diminished by the credit in *Schreiner* is significantly different from the theoretical nature of the tax liability affected by the investment credit in this case.

As the legislative history of the 1984 amendments to the Act reveals, the overarching intent and purpose of the Legislature was to assure that the casino licensees would immediately begin to make investments in Atlantic City and, eventually, in other parts of the State in accordance with the allocation schedule set forth in the Act. See *N.J.S.A.* 5:12–144.1(f) (allocating one hundred percent of investment funds to Atlantic City during first three years, ninety percent in years four and five, eighty percent in years six through ten, and lesser amounts thereafter, with increasing amounts allocated to South Jersey and North Jersey). Although the 1984 amendment imposed a 2.5 percent investment alternative tax on casino winnings, that tax for all practical purposes was enacted only to induce casinos to elect the investment alternative and the Legislature never contemplated that its collection would occur. As the amendment was structured, the additional 2.5 percent tax would be avoided by any casino that elected instead to purchase CRDA bonds, or make authorized investments or donations in an amount equal to 1.25 percent of annual casino winnings. Obviously, all casinos have elected to invest annually 1.25 percent of their "take," and none have elected to pay the alternative 2.5 percent tax. Although statutorily denominated a "credit," in reality the 1.25 percent investment option was an alternative to

the added tax, an alternative so clearly more attractive that the Legislature understood that no casino would elect to pay the additional tax.

In that context, we find highly theoretical the assertion that the 1.25 percent investment alternative improperly diverted funds dedicated by the Casino Amendment when, in reality, the Legislature never intended to collect additional revenue from the tax on casino winnings. Obviously, an entirely different and much more formidable constitutional challenge would be presented if the investment alternative authorized by the 1984 legislation were available as a credit against the eight percent tax on gross revenue already being collected under the Act. In that event, the diversion of constitutionally dedicated funds would be clear and compelling. But given the background of the 1984 amendments to the Act, there is little doubt that the Legislature intended that no increase in the amount of funds dedicated to seniors and the disabled would result from those amendments, and the Legislature's primary and overriding goal was to stimulate casino investments in Atlantic City and throughout the State. Accordingly, we reject defendant's contention that the investment alternative mechanism in the 1984 amendments unconstitutionally diverted dedicated funds in violation of the Casino Amendment.

The CRDA also argues persuasively that the credit mechanism enacted in 1984 by the Legislature was a reasonable and appropriate means for encouraging investment in Atlantic City and elsewhere that could have been mandated as a condition of casino licensure. The CRDA relies on this Court's opinion in *Holmdel Builders Ass'n v. Township of Holmdel,* 121 *N.J.* 550, 572, 576, 583 *A.*2d 277 (1990), for our holding that the Fair Housing Act, *L.* 1985, *c.* 222, provided a statutory basis for the imposition by municipalities, *as a condition of development approval,* of development fees intended to assist in the financing of affordable housing. Noting "the uniqueness of the regulated activity, the pervasiveness of the regulatory environment and the strained and diminishing supply of land resources in Atlantic City," the CRDA asserts

that the Legislature constitutionally could have mandated as a condition of casino licensure a level of investment in Atlantic City comparable to the level of investment resulting from the 1984 amendments to the Act. We need not resolve that issue in this proceeding. We already have emphasized the strength of the connection between the legislative authorization of casino gambling and the goal of revitalizing Atlantic City and are impressed with the soundness of the Legislature's recognition that the two are inextricably linked. That the Legislature chose to foster investment in Atlantic City and elsewhere by the mechanism of the investment alternative tax, rather than by other means, does not diminish our obligation to view tolerantly and with restraint the presumed validity of a legislative enactment. *McCrane, supra*, 61 *N.J.* at 8, 292 *A.*2d 545. In the absence of any realistic demonstration that the selected legislative mechanism diverted, or even posed a risk of diverting, dedicated funds from seniors and disabled citizens, we decline to invalidate the 1984 amendments on the basis that they authorize an unconstitutional diversion of dedicated funds.

C. Irrespective of their Characterization, the Proceeds of the Investment Alternative Tax Program Constitutes State Revenues Derived from Casino Gambling Establishments and Constitutionally Cannot be Used for Non–Dedicated Purposes

 Defendants combine numerous specific contentions to support their general assertion that, however denominated, the proceeds of the investment alternative tax program are "taxes," that they have been coerced for the purpose of supporting State programs, and that consequently such proceeds must constitute "State revenue" that can be used only for dedicated purposes.

We already have rejected defendant's contentions that the term "State revenues" as used in the Casino Amendment was intended to encompass the proceeds of investments by casino licensees pursuant to the Act in its original form or pursuant to the 1984

amendments, *supra* at 527–28, 734 *A*.2d at 1175–76, and that any tax credit against a dedicated tax is necessarily unconstitutional, *supra* at 529–34, 734 *A*.2d at 1176–79. The contention we now address focuses on the character of the proceeds of casino "investments" pursuant to the 1984 amendments and whether such proceeds actually constitute "State revenues" within the meaning of the Casino Amendment. Because the record before us provides only limited information concerning the amounts and characteristics of the casino investments in issue, we have requested counsel to supplement the record in certain respects.

Initially, we note again the Legislature's clearly expressed intention that approved investments pursuant to the 1984 amendments are to be deemed investments and are not to be regarded as State revenue. *N.J.S.A.* 5:12–144.1(i) provides in part:

> Any purchase by a licensee of bonds issued by or offered through the Casino Reinvestment Development Authority pursuant to sections 14 and 15 of this act and subsection b. of this section and all approved eligible investments made by a licensee pursuant to section 25 of this act and subsection b. of this section are *to be considered investments and not taxes owed or grants to the State or any political subdivision thereof.*

> [Emphasis added.]

That same understanding of the 1984 amendments was conveyed to Governor Thomas H. Kean in the Passed Bill memo from his Chief Counsel:

> Investments made pursuant to this act are to be considered investments and not taxes owed or grants to the State.

> . . . .

> The CRDA may take any steps it deems necessary to protect the characteristics of the investments with a prospect of return of principal and interest.

> [Passed Bill Memo (A–688/S–1402 and S–592), Chief Counsel to Honorable Thomas H. Kean, Governor, December 17, 1984 at 3–4.]

To defendant's contention that the proceeds of the casinos' investments nevertheless constitute "State revenues," the CRDA responds that both the Legislature's intent and the actual characteristics of the uses to which the proceeds are put demonstrate that those proceeds are not "State revenues." Conceptually, we generally understand the term "State revenue" to mean the

money received by the State from taxes, fees and other levies that may thereafter be used by the State for public purposes. *Black's Law Dictionary* defines "public revenues" in a manner consistent with that understanding:

> The income which a government collects and receives into its treasury, and is appropriated for the payment of its expenses. Annual or periodical yield of taxes, excise, custom, dues, rents, etc., which a nation, state or a municipality collects and receives into treasury for public use; public income of whatever kind. Current income of nation, state, or local government from whatever source derived which is subject to appropriation for public uses.
>
> [*Black's Law Dictionary* 1319 (6th ed.1990) (citations omitted).]

The character of the proceeds of investments made by casinos pursuant to the 1984 amendment stands in sharp contrast to that generalized understanding of the concept of State or public revenue. The primary investment options for casino licensees under the 1984 amendments are CRDA bonds or CRDA approved investments, which for the ten years immediately following the amendments constituted the only permitted investment options. See *N.J.S.A.* 5:12–144.1(b). Thereafter at least fifty percent of annual licensee investments must be in CRDA bonds or approved investments, and the balance may consist of direct investments or donations in approved projects. *Ibid.* The CRDA's 1998 annual report describes the outstanding CRDA bonds as carrying maturities ranging from thirty-five to fifty years and bearing interest at rates ranging between four and seven percent. The Act requires that CRDA bonds bear interest at rates no lower than two-thirds of market rates. *N.J.S.A.* 5:12–162(d).

Defendant maintains that the bonds, because of their lower-than-market interest rates and extended maturities, are unattractive investments. Defendant clearly is correct, but the unattractiveness of CRDA bonds by market standards does not transform the funds used to acquire them into "State revenues." On the CRDA's balance sheet, the bond proceeds represent borrowed funds subject to an obligation to repay the principal in full and pay interest at the stated rate. As such, the bond proceeds scarcely resemble "State revenue" from the perspective of the CRDA, and from the casino licensees' perspective the bonds constitute an

interest bearing obligation requiring repayment in full at maturity. We fully acknowledge that, with a free choice, casino licensees would be unlikely to buy CRDA bonds. But those bonds unmistakably constitute investments of the casino licensees, and hence cannot be characterized as "State revenues" for purposes of the Casino Amendment.

A similar analysis applies to CRDA projects approved for investment by licensees. The CRDA's regulations define projects eligible for CRDA approval as those undertaken to satisfy the purposes of the CRDA. *N.J.A.C.* 19:65–1.2. Among the approval criteria for CRDA-approved projects is a requirement

> that the project is sufficiently financially feasible such that it has the minimum characteristics of an investment in that a degree of assurance exists that interest and principal payments can be made and other terms of the proposed investment be maintained over the period thereof and that a loan of the bond proceeds in connection therewith would qualify for a bond rating of "C" or better.
>
> [*N.J.A.C.* 19:65–2.5.]

Because the CRDA-approved projects are required to meet the same investment grade standards as the Act requires for CRDA bonds, see *N.J.S.A.* 5:12–144.1(i), we conclude that licensee investments in CRDA-approved projects also must be characterized as investments, and that their proceeds cannot constitute "State revenues" when received by the CRDA.

As noted, *supra*, at 525–26, 734 *A.*2d at 1174, after the ten-year period subsequent to the 1984 amendments, see *N.J.S.A.* 5:12–144.1(b), casino licensees also may receive a two-for-one credit against the additional 2.5 percent tax on gross revenues by making direct investments in or donations to projects approved by the CRDA on application by individual casino licensees. See *N.J.S.A.* 5:12–173 and –177. Projects approved for direct investment or for donation must be undertaken for purposes consistent with the statutory mission of the CRDA. See *N.J.A.C.* 19:65–1.2, –2.8 and –2.9. The application process for projects for direct investment or donation is essentially the same process as is required for CRDA-approved projects, see *N.J.A.C.* 19:65–2.8 and –2.9, and we are informed that the CRDA's review is guided by the same

approval criteria and priorities that apply to CRDA-approval projects. *N.J.A.C.* 19:65–2.5 and –2.6. (Letter from Michael Cole, counsel to CRDA, to Stephen Townsend, Clerk, New Jersey Supreme Court (May 27, 1999) (CRDA letter)). Although the CRDA letter includes descriptions of projects funded with direct investments approved by the CRDA, the record does not inform us adequately about the general characteristics of direct investments made by casino licensees. Because such direct investments are elective, as a statutory alternative to CRDA bonds or investments in CRDA-approved projects, we infer that sophisticated casino licensees would not voluntarily make direct investments in projects that would yield a significantly lower return than the CRDA bonds or CRDA-approved projects. Moreover, no statutory or regulatory provision mandates that the CRDA participate directly or indirectly in projects approved as direct investments, and therefore the CRDA need not obtain any access to the proceeds of such investments. Accordingly, we conclude on this record that the casino licensees' direct investments in projects approved by the CRDA qualify as "investments" under the Act, and that accordingly their proceeds cannot constitute "State revenues" under the Casino Amendment.

Finally, the CRDA letter includes examples of approved projects funded at least in part by donations, but informs the Court that "the types of projects the Authority approves involving donations generally are projects or programs that cannot be financially structured in a manner that would reasonably support an expectation of a return on investment." The examples provided by the CRDA letter include a donation of funds by licensees to assist in the construction of a new facility for the Boys and Girls Club of Atlantic City, a donation of funds toward the construction of a Jewish Older Adult Services Facility, a donation of funds toward an affordable housing project in Atlantic City, and a donation of funds to acquire property to be leased by the CRDA to a developer of a new supermarket and other retail uses. The Act specifically authorizes the CRDA to permit a licensee "to obtain an investment tax credit by making a donation of money or realty to

an eligible project, facility or program," and provides that any such "donation shall be deemed to be an investment." *N.J.S.A.* 5:12–177. The CRDA's 1998 Annual Report states that the amount of donations by licensees through December 31, 1998 equaled $141,985,518, but the record before us does not adequately reflect the nature and variety of projects that have been financed wholly or in part by donations. Nevertheless, because donations are a statutory alternative to CRDA bonds or CRDA-approved projects which do provide returns on funds invested, we infer that the licensees that have applied for and received permission to make donations have done so in the exercise of sound business judgment. To the extent the record informs us, it does not appear that the CRDA necessarily is involved in projects funded wholly or in part by donations, so that the proceeds of such donations cannot generally be described as funds received by the CRDA such as to constitute "State revenues." In view of the legislative authorization of donations, and their purely voluntary character under the Act, we do not consider the absence of a predictable return on such donations to be critical. Accordingly, as with the other categories of investment proceeds, we do not regard the proceeds of statutorily authorized donations by licensees to constitute "State revenues" under the Casino Amendment.

## V

The parking fees authorized by *L.* 1993, *c.* 159, clearly constitute State revenue. That legislation imposed a fee of $1.50 per day on casino parking spaces payable by the licensee to CRDA for its use on eligible projects in the corridor region of Atlantic City. The lower courts concluded, however, that that revenue was not revenue derived from the "operation of . . . gambling establishments" within the meaning of the Casino Amendment. "The fee bears no relationship to a licensee's gambling operations and is derived from gamblers and non-gamblers alike who use a casino parking facility and park in Atlantic City." 314 *N.J.Super.* at 677, 715 *A.*2d 1052. We agree with that conclusion.

We note that *N.J.S.A.* 5:12–19, as amended in 1996, sets forth the following definition of "establishment" and "casino hotel facility":

5:12–19. *"Establishment", "casino hotel" or "casino hotel facility"*

"Establishment" or "casino hotel" or "casino hotel facility"—A single building, or two or more buildings which are physically connected in a manner deemed appropriate by the commission, containing an approved hotel, a casino and, if applicable, a casino simulcasting facility.

That definition excludes parking spaces from the configuration of a casino hotel facility. More to the point, the parking fees plainly are not revenues derived from casino gambling, nor are they the type of casino-related revenue that the Legislature intended to be dedicated to eligible senior and disabled citizens. Accordingly, we sustain the constitutionality of the parking fee legislation.

## VI

Our resolution of the various legal issues raised by defendant also is informed by our understanding, enhanced by this record, that in fact the Legislature has kept faith with the Casino Amendment's dedication of the tax on licensees' gross revenue to eligible senior and disabled citizens. As noted, in excess of $3.5 billion dollars has been made available for those dedicated purposes since the inception of casino gambling. We are convinced that the salutary purpose of the 1984 amendments was to stimulate investment by licensees in Atlantic City and elsewhere, and that those amendments were not intended, nor was it their effect, to deprive seniors and disabled citizens of the benefit of dedicated State revenues.

We affirm the judgment of the Appellate Division.

O'HERN, J., *concurring.*

When two widely respected members of the Court dissent on a constitutional issue of such profound significance, it gives me pause.

However, in this instance I believe that the contemporary news accounts quoted in the dissent better portrayed the meaning of the amendment than does the opinion.

Those who say the amendment is misleading in promising great rewards for the taxpayers of New Jersey are overlooking the fact that those who drafted the amendment and those who support it have never promised the people of New Jersey a bonanza as a result of casinos in Atlantic City. But in preparing the legislation they made realistic provisions to *share eight per cent of the gross revenue from gaming with those with the greatest need-senior citizens and the disabled.*

> [*Post* at 545, 734 *A.*2d at 1185 (quoting *Statewide Referenda: Seven Questions,* Trentonian, Oct. 31, 1976, at 36) (emphasis added).]

That was the promise, made to the people in 1976, with which the Legislature and the Court have kept faith.

If "the State's revenues" from gambling casinos meant "all the State's revenues," as the dissent suggests, *post* at 546–55, 734 *A.*2d at 1186–92, then the dissent should require the State also to turn over the Corporation Business Tax and Sales Tax revenues derived from "gambling casinos" to seniors and the disabled.

I do not find that suggestion in the dissenting opinion, leading one to conclude that, despite its high-sounding tone, the dissent is internally inconsistent.

HANDLER and POLLOCK, JJ., dissenting.

The issue is whether the Casino Reinvestment Act (CRA), *N.J.S.A.* 5:12–144.1, violates Article IV, § 7, ¶ 2 of the New Jersey Constitution (the "Casino Amendment" or "Amendment"), which requires that all State revenues from casino gambling benefit senior citizens and disabled residents. Resolution of that issue depends on whether the CRA authorizes the expenditure of designated revenues for other purposes. We believe that the CRA dedicates revenues to such other purposes. Consequently, we respectfully dissent.

I.

In 1976, the State presented New Jersey voters with this question:

## CONSTITUTIONAL AMENDMENT

### CASINOS IN ATLANTIC CITY FOR THE BENEFIT OF SENIOR CITIZENS AND DISABLED RESIDENTS OF THE STATE

Shall the Constitution be amended, as agreed to by the Legislature, to authorize the Legislature to establish *and regulate* gambling casinos in Atlantic City, with the State's *revenues* therefrom being *applied solely* to reduce property taxes, rentals, and telephone, gas, electric and municipal utilities charges of eligible senior citizens and disabled residents of the State?

Following voter approval at the general election, the New Jersey Constitution was amended to read:

It shall be lawful for the Legislature to authorize by law the establishment and operation, under regulation and control by the State, of gambling houses or casinos within the boundaries, as heretofore established, of the city of Atlantic City, county of Atlantic, and to license and tax such operations and equipment used in connection therewith. *Any law authorizing the establishment and operation of such gambling establishments shall provide for the State revenues derived therefrom to be applied solely for the purpose of providing funding for reductions in property taxes, rental, telephone, gas, electric, and municipal utilities charges of, eligible senior citizens and disabled residents of the State, and for additional or expanded health services or benefits or transportation services or benefits to eligible senior citizens and disabled residents, in accordance with such formulae as the Legislature shall by law provide.* The type and number of such casinos or gambling houses and of the gambling games which may be conducted in any such establishment shall be determined by or pursuant to the terms of the law authorizing the establishment and operation thereof.

[*N.J. Const.* art IV, § 7, ¶ 2(D) (emphasis added).]

Simply stated, the Casino Amendment requires revenues derived from the operation of casinos to be applied solely for the purpose of providing services or benefits for eligible senior citizens and disabled residents. The CRA, however, permits revenues paid by casinos to the State to be spent on miscellaneous purposes unrelated to senior citizens and the disabled. Although many of these purposes may be worthwhile, the Constitution does not

permit the expenditure of State revenues derived from casinos for unauthorized purposes, commendable or not. The plain language of the Casino Amendment precludes the use of State revenues for purposes authorized by the CRA. Nothing more is needed to sustain the conclusion that the CRA is unconstitutional.

Although unnecessary to resolve this appeal, a fuller appreciation of the issue starts with the general prohibition on gambling in the New Jersey Constitution. *N.J. Const.* art. IV, § 7, ¶ 2. Only by means of a constitutional amendment, approved by a majority of voters, could the Legislature surmount that constitutional prohibition.

In 1974, the public rejected a referendum that would have permitted State-owned and -operated casinos throughout New Jersey. In commenting on the defeat of the 1974 proposal, Assemblyman (now Senator) Robert Littell stated that the public

> felt that they would rather go to that type of casino [a charitable organization "Monte Carlo" night] where they know that the money is going for a charitable organization than to go to a statewide casino or state casino, because they don't want the money going to the State Treasury, or whatever it is earmarked for.
>
> [*Public Hearing on Assembly Concurrent Resolution 126* (Apr. 14, 1976) (statement of Assemblyman Littell).]

In 1976, the Legislature again sought public approval of casino gambling. Article IX, ¶ 7 of the State Constitution stipulates that once voters have rejected a proposed amendment, the Legislature must wait until the third general election following the rejection before submitting a substantially similar amendment to the electorate. Here, the Legislature did not want to wait. Consequently, in 1976 it introduced concurrent resolutions in the Assembly and Senate for a modified proposal on casino gambling. The identical resolutions, Assembly Concurrent Resolution 126 (ACR 126) and Senate Concurrent Resolution 103 (SCR 103) differed from the 1976 proposal in several material respects. *See Young v. Byrne*, 144 *N.J.Super.* 10, 364 *A.2d* 47 (Law Div.1976) (1976 referendum sufficiently different from 1974 referendum that Constitution did not impose waiting period between proposals). First, the casinos were to be privately owned and operated. Second,

they were to be confined to Atlantic City. Finally, and of critical importance to this appeal, the State revenues generated from casino gambling were to be used exclusively to benefit senior citizens and disabled residents.

Statements made at the public hearing on ACR 126 confirm that the revenues were to be used solely for senior citizens and disabled residents. Assemblyman Howard Kupperman, one of the sponsors of ACR 126, stated:

> The State will have a take from the very top, and this money very specifically is set forth. The proceeds will be used not in the general treasury, so they can be lost, as has been done with proceeds from other revenue sources, and people years from now can come back and say, "What happened to the money," but these proceeds will be specifically dedicated and I quote from the bill, "... for the reduction of property taxes, rentals, telephone, gas, electric, and municipal utilities charges of eligible senior citizens and disabled residents of the State...." So the senior citizens and disabled persons will get the benefit, and this money will not be in a general fund, but will be specifically used for this purpose, and as such, whatever money is raised, whether it be $5 million or $10 million or $20 million or $50 million, it will have a definite impact on these areas.
>
> [*Public Hearing on ACR 126* (Apr. 14, 1976) (statement of Assemblyman Kupperman).]

Senator Joseph McGahn, who sponsored SCR 103, emphasized the importance of the dedication of casino revenues for the benefit of senior citizens:

> Now, nationwide today there are any number of states that are exploring gambling by the State as a means of increasing revenue. We do not consider this, to be perfectly honest with you, as primarily a revenue producing measure. I can understand your concern about the dedication of these revenues to senior citizens, because it would be an attractive means to get senior citizens to support this. But I think also, by the same token, given the present fiscal situation in the State, and given the reluctance of the Legislature to give commitments for human services, for human needs, certainly there would be nothing wrong with this approach, and I assure you it is certainly not a ploy. I think it is a reasonable way of doing it. At the present time Pennsylvania is doing the same thing, as far as providing transportation to the senior citizens free and various other amenities to senior citizens. That was primarily the legislative intent in back of this.
>
> [*Id.* (statement of Senator McGahn.)]

Comments of several concerned citizens confirm the public's understanding that the purpose of the 1976 Amendment was to consign all State revenue from gambling to senior citizens and disabled residents: "ACR-[1]26 must be looked upon with favor,

since the revenue derived from legalized gambling will be dedicated to our senior citizens." *Id.* (statement of Charles Davis). "It seems to me [ ] that dedicating the revenues to help senior citizens is misleading. Everybody wants to help senior citizens, and many will vote for this amendment without realizing its implications." *Id.* (statement of Mary Tanner).

Finally, pre-election newspaper editorials, both those opposed to approval of the referendum and those in favor of approval, substantiate that the public understood that the State's revenues from gambling were to be dedicated to assisting senior citizens and disabled residents: "The referendum itself is slightly different this time too. It calls for casino gaming restricted to Atlantic City, run by private interests, with revenues dedicated to senior citizens' needs." Fred Hillman, *Casinos Getting Better Odds This Time Around,* Star–Ledger, Oct. 10, 1976, at 4. "Atlantic City might get a quick fix—some new hotels, some new ancillary businesses. The state treasury would get a modest amount of tax revenue, earmarked for senior citizens (a cynical ploy to milk votes if there ever was one)." *Still No Dice,* Trenton Times, Oct. 29, 1976, at A14.

> We think [rejection of the referendum] would be too bad not just for Atlantic City, which has a chance for a new life, but the entire state as well, which would benefit directly and indirectly from the improved economy in Atlantic City. For one thing, the state's share of proceeds will go to senior citizen assistance.
>
> [*Statewide Referenda: Seven Questions,* Trentonian, Oct. 31, 1976, at 36.]
>
> Those who say the amendment is misleading in promising great rewards for the taxpayers of New Jersey are overlooking the fact that those who drafted the amendment and those who support it have never promised the people of New Jersey a bonanza as a result of casinos in Atlantic City. But in preparing the legislation they made realistic provisions to share eight per cent of the gross revenue from gaming with those with the greatest need—senior citizens and the disabled.
>
> [*Atlantic City's Future: Casinos Yes,* Press, Oct. 29, 1976, at 1.]
>
> New Jersey voters overwhelmingly defeated legalized gambling casinos two years ago. New Jersey's best interests will be served if they reject casinos again Tuesday despite the fact that the proposal would restrict the risks of casinos to Atlantic City and provide state tax revenue that would be "applied solely to reduce property taxes, rentals, and telephone, gas, electric and municipal utilities charges of eligible senior citizens and disabled residents of the state." ... The dedication

of gambling taxes to reduction of property taxes and utility bills for seniors and disabled citizens is a ploy to clothe the proposal with respectability and treat the seniors and disabled as pawns.

[*Risks of Casino Gambling*, Asbury Park Press, Oct. 29, 1976, at A22.]

## II.

In concluding that the proposed constitutional amendment contemplated the expenditure of State revenues for purposes other than assisting senior citizens and disabled residents, the majority commits three analytical errors. First, it ignores the plain language of the Casino Amendment as an ordinary person would understand it. Second, despite the lack of ambiguity in the Amendment's language, the majority revisits the Amendment's legislative history. In doing so, it conflates legislative statements made after the voters approved the constitutional Amendment with those made prior to obtaining that approval. It even uses the legislative history of the statute at issue to support its interpretation of a constitutional amendment adopted eight years before that statute. Finally, the majority confuses the anticipation of indirect economic benefit to Atlantic City from the arrival of casinos with an expectation of direct benefit from State revenues derived from the tax on those casinos.

## A.

Under standard rules of constitutional interpretation, the Casino Amendment must be strictly construed. In *State v. Apportionment Commission*, 125 *N.J.* 375, 382, 593 *A.2d* 710 (1991), the Court explained the proper means of assessing the language of a constitutional amendment, relying on the approach used to assess the validity of an interpretive statement. That approach inquires whether the interpretive statement "suffer[s] from an ambiguity so fundamental that a voter could not intelligently understand [its] effect." *Kimmelman v. Burgio*, 204 *N.J.Super.* 44, 52, 497 *A.2d* 890 (App.Div.1985) (citations omitted); *cf. New Jersey Ass'n on Correction v. Lan*, 80 *N.J.* 199, 208, 403 *A.2d* 437 (1979) (rejecting challenge to validity of interpretive statement because "[c]onsider-

ing the question and Interpretive Statement on the ballot as to this bond issue, [ ] one would wonder how any literate voter could be misled or fail to have 'an understanding appraisement of the project' "). In *Apportionment Commission,* the Court wrote that the critical question in interpreting the language of a constitutional amendment is: "[D]oes the public question 'tell the ordinary voter what is involved'?" 125 *N.J.* at 382, 593 *A.*2d 710 (citing *Gormley v. Lan,* 88 *N.J.* 26, 37, 438 *A.*2d 519 (1981)). The Court explained:

"[T]hat the words employed [in the Constitution] have been carefully measured and weighed to convey a certain and definite meaning, with as little as possible left to implication" is presumed. We should therefore "inquire as to the meaning the symbols of expression would most naturally and plainly convey, the sense most obvious to the common understanding ... [for] [t]he Constitution was written 'to be understood by the voters.' "

[*Ibid.* (citations omitted).]

Several years earlier, in *Atlantic City Racing Ass'n v. New Jersey,* 98 *N.J.* 535, 489 *A.*2d 165 (1985), the Court gave even more explicit instructions concerning the strict construction that is involved in the interpretation of an amendment:

While a constitutional limitation is in its very nature inflexible in meaning and immune to varying public opinion, social and economic needs arising from complexities of modern life call for new applications of the principle. It can be accommodated to new needs, however, only where it will not contravene the intent of the instrument. While it may be appropriate to give a liberal reading to what Justice Holmes referred to as the "great ordinances of the Constitution" as they may have relevance to the problems of the day, more literal adherence to the words selected in those clauses carefully defining the mechanics and administration of government is mandated. As Justice Mountain wrote in *Vreeland v. Byrne,* 72 *N.J.* 292[, 304–05, 370 A.2d 825] (1977):

Not all constitutional provisions are of equal majesty. Justice Holmes once referred to the "great ordinances of the Constitution." Within this category would be included the due process clause, the equal protection clause, the free speech clause, all or most of the other sections of the Bill of Rights, as well as certain other provisions. The task of interpreting most if not all of these "great ordinances" is an evolving and on-going process....

But there are other articles in the Constitution of a different and less exalted quality. Such provisions generally set forth—rather simply—those details of governmental administration as are deemed worthy of a place in the organic document. Examples from our own Constitution might be the clause in Art. 4, § 4, ¶ 6 that requires bills and joint resolutions to be read three times in each house before final passage; or the provision in Art. 4, § 5, ¶ 3 declaring that

upon a member of the Legislature becoming a member of Congress, his seat in the Legislature shall thereupon become vacant; or the requirement set forth in Art. 5, § 1, ¶ 2 that the Governor shall be not less than thirty years of age.

Such constitutional provisions as these, and others like them, important as they doubtless may be, are entirely set apart from the "great ordinances" mentioned above, and as a matter of constitutional interpretation should receive entirely different treatment. Where in the one case the underlying spirit, intent and purpose of the Article must be sought and applied as it may have relevance to the problems of the day, in the other a literal adherence to the words of the clause is the only way that the expressed will of the people can be assured fulfillment.

[*Id.* at 544–46, 489 *A.*2d 165 (citations omitted).]

As previously indicated, the Casino Amendment must be read literally and restrictively. That Amendment provides for State revenues derived from casino operations to

be applied solely for the purpose of providing funding for reductions in property taxes, rental, telephone, gas, electric, and municipal utilities charges of eligible senior citizens and disabled residents of this State, and for additional or expanded health services or benefits or transportation services or benefits to eligible senior citizens and disabled residents.

[*N.J. Const.* art. IV, § 7, ¶ 2.]

Accepted standards of constitutional interpretation do not support the inference that one of the Casino Amendment's articulated purposes was to improve Atlantic City or any other area of the State. By the Amendment's express terms, the State's revenue was to be applied to the needs of senior citizens and the disabled.

Moreover, the constitutional language precisely delineates how casino revenues are to be used for senior citizens and disabled residents. The Amendment directs the Legislature to exercise a narrow discretion in determining how casino revenues may be spent in respect of senior citizens and the disabled. Application of those revenues on behalf of senior citizens and disabled persons is expressly limited to the reduction of property taxes, rental, telephone, gas, electric and municipal utilities charges, and for health and transportation services or benefits. Accordingly, even if the revitalization of Atlantic City were itself a "benefit" to senior citizens or disabled residents, the pointed language of the Casino

Amendment does not authorize that funds be spent for that purpose.

## B.

Despite the lack of ambiguity in the Casino Amendment, the majority interprets it by examining the legislative history of both the Amendment and the Casino Control Act (CCA), *N.J.S.A.* 5:12–1 to 5:12–194. The Court engages in this analysis despite its acknowledgment of the

> familiar rule of construction that where phraseology is precise and unambiguous there is no room for judicial interpretation or for resort to extrinsic materials. The language speaks for itself, and where found in our State Constitution the language is the voice of the people.
>
> [*Ante* at 527, 734 *A.*2d at 1175 (quoting *Vreeland v. Byrne*, 72 *N.J.* 292, 302, 370 *A.*2d 825 (1977)).]

Even when an examination of legislative history is appropriate, statements made by supporters of a constitutional amendment during the course of its enactment and adoption must be scrutinized carefully. Statements that are part of the official legislative history of the amendment should be distinguished from those that are merely partisan and unofficial in nature. For example, in *Dickinson v. Fund for the Support of Free Public Schools*, 95 *N.J.* 65, 81–84, 469 *A.*2d 1 (1983), the dissent criticized the majority's citation of statements attributed to various individuals in the course of the enactment and adoption of the Tidelands Amendment because the statements were reflective of a "partisan position based upon one possible interpretation of the amendment" and hence did "not define either the purpose of the constitutional amendment or the intent of the people in adopting it." *Id.* at 94, 469 *A.*2d 1 (Handler, J., dissenting). Although the statements were made by administration officials, the dissent observed that they

> should be accorded no determinative weight in ascertaining legislative intent of the amendment, absent an indication of an adoption of such expressions as the views of the framers or the adopters of the amendment. 2A Sutherland, *Statutory Construction*, § 48.10 at 210 (4 ed. Sands 1973); *State v. Exxon Corp.*, 151 *N.J.Super.* 464, 376 *A.*2d 1339 (Ch.Div.1977).
>
> [*Id.* at 94–95 n. 2, 469 *A.*2d 1 (Handler, J., dissenting).]

In the present case, the majority oscillates between examining statements made in the Legislature before the election and state-

ments made afterward. Pre-election, the legislators spoke extensively about aid to senior citizens and about revitalizing Atlantic City. They never spoke of using tax revenues to revitalize Atlantic City nor of using tax revenues to revitalize the rest of the State.

Similarly, before the election, the people were told that all of the money generated from casino gambling would go to senior citizens. Only after the election was a specific proportion of revenues, namely 8%, mentioned for use in the dedicated programs. Four months after approval of the referendum, during a public hearing on the CCA, Senator McGahn said:

> I would like to make one point and that concerns the possibility of deriving some direct income from casinos, which we had not originally anticipated. Apparently, at the present time, there is a Federal Tax Stamp of $250 placed on each of the slot machines in any casino. The way it is worked in the State of Nevada is simply that $200 goes to the State and $50 goes to the Federal Government. The $200 that goes to the State is a matter of a tax credit against the tax revenue that is owed to the Federal Government.
>
> . . . .
>
> ... I would honestly anticipate that somewhere down the line—and I don't think this will be in the very beginning—probably like Nevada has at the present time, there will be a tiered-tax type of situation and this is allocated back either to the city, the county, or the convention bureau—as the case may be. When we realize our maximum potential as far as that is concerned, then I think under those circumstances there probably can be a different taxing system than we may be proposing in the beginning. So, part of the profits of this type of industry may be going back into bettering the cultural and recreational climate of this area and possibly helping to relocate people who may be dislocated by the impact of casino gambling in Atlantic City.
>
> [*Public Hearing on S1780* (Mar. 2, 1977) (statement of Senator McGahn).]

Many other statements cited by the majority as demonstrating a public and legislative understanding similarly were not uttered until after the election. *See, e.g., ante* at 518, 734 *A.*2d at 1169 (quoting 314 *N.J.Super.* 651, 668, 715 *A.*2d 1052 (Law Div.1997) (quoting *N.J.S.A.* 5:12–1(b)(4)(CCA))); *ibid.* (quoting 314 *N.J.Super.* at 668, 715 *A.*2d 1052 (quoting *N.J.S.A.* 5:12–1(b)(5)(CCA))); *id.* at 520–21, 734 *A.*2d at 1171 (quoting 314 *N.J.Super.* at 671–72, 715 *A.*2d 1052 (quoting R. Benjamin Cohen, *Casino Gambling: The Elements of Effective Control,* 6 *Seton Hall Legis. J.* 55 (1982))). Briefly stated, statements made after the 1976 general

election are not part of the legislative "history" of the Casino Amendment.

Lastly, the majority uses the legislative intent behind and the words of the CRA to establish its constitutionality. The majority notes that *N.J.S.A.* 5:12–144.1(i) states that any purchases of bonds pursuant to the act "are to be considered investments and not taxes owed or grants to the State or any political subdivision thereof." *Ante* at 525, 734 *A.*2d at 1174 (quoting *N.J.S.A.* 5:12–144.1(i)); *see also id.* at 533–34, 734 *A.*2d at 1178–79 (interpreting history of 1984 statutory amendment). As helpful as legislative history may be when interpreting a statute, that history cannot usurp the judicial obligation to determine the statute's constitutionality.

## C.

Even after the 1976 election, the Legislature recognized that the rehabilitation of Atlantic City was to occur through the investment of private funds. The statement accompanying Senate Bill 1780, which became the CCA, provides:

> This bill is intended to implement the constitutional amendment, approved by the people at the general election of November 2, 1976, authorizing the Legislature to provide for casino gambling in Atlantic City.

> The objectives of the bill and the persons and localities affected are set forth in subsection b. of section 1 as a statement of findings and declaration of policy by the Legislature. Revenues derived from the taxation of casinos established pursuant to this act will be devoted, pursuant to the constitutional amendment and Section 105 of this bill, to reduce senior citizens' property taxes, rentals and utility expenses.

> [Statement Accompanying Senate Bill 1780 (1977).]

Atlantic City would enjoy both a direct benefit and a "ripple effect." As a leading text on the Casino Amendment states:

> The local economy was supposed to boom in Atlantic City in a way that couldn't help but benefit the merchants who have long comprised the core of the private sector.

> It was called the "ripple effect," and it was supposed to work something like this: The tourists come to the casino hotels, bringing in the dollars by the bushelful (dropping more than $2.1 billion in the 11 casinos in 1986). The dollars would then

be recirculated into the pockets of employees, and into the bank accounts of businesses that supply the casinos. These employees and businesses would then purchase more goods, expand their own investments, and patronize local businesses. The local businesses would then do some expanding of their own, increase their inventories, and hire more employees. These employees would then patronize other merchants, who would then hire more employees who would patronize the casinos and the other merchants and then more employees would be hired, housing would be built, business would expand, and on and on.

[Michael Pollock, *Hostage to Fortune: Atlantic City and Casino Gambling* 155 (1987).]

## Senator McGahn testified to the same effect at a hearing on the CCA:

To accomplish these purposes [a revitalized Atlantic City], my amendments will add language to the public policy statement of Section 1 of the legislation which specifies that legalized casino gaming in Atlantic City has been approved by the citizens of New Jersey as a unique form of urban redevelopment in language which considers the casinos as the catalyst to stimulate the redevelopment of existing blighted areas, the refurbishing and expansion of existing hotels, convention, tourist, entertainment, recreational, and cultural facilities.

. . . .

. . . I would like to state that at the time we were selling this in the State, we were selling this to rebuild and redevelop Atlantic City. We were selling this and using casinos as an instrument and not as an end in and of itself, to attract investment capital, to attract new investment, to get 10,000 first class hotel rooms by 1985 so that the faltering convention business could be reinforced and so that there could be increased job opportunities, there could be increased jobs and an attempt to cut down on the unemployment rolls in Atlantic City which, incidentally, is one of the highest in the State.

[*Public Hearing on S1780* (Mar. 2, 1977) (statement of Senator McGahn).]

### A leading scholar writes:

The centerpiece of the 1976 proposal was the use of casino gambling as a tool for the redevelopment of Atlantic City. Casino advocates argued that the legalization of casinos would be a major ingredient in the economic revitalization of the city, and they claimed that casino development would create between twenty and thirty thousand new jobs.

[Richard Lehne, *Casino Policy* 35 (1986).]

The Casino Control Act actually earmarked no state funds for development purposes. The statute assumed that investment in Atlantic City's casinos and entertainment facilities would stimulate the redevelopment of the rest of the community, and it presumed that the economic activity generated by casinos would attract the non-state resources required to meet the community's housing and infrastructure needs. In addition to the specialized tax obligations created by the casino act, casino companies were also obliged to pay the normal federal, state, and local taxes.

[*Id.* at 153.]

Consistent with these analyses, the Casino Amendment never mentioned the use of State revenues for the redevelopment of Atlantic City. Indeed, the majority acknowledges that redevelopment, although a "primary objective" of the Amendment, was to be generated by the casinos' direct investment in Atlantic City and from the resulting ripple effect.

> [T]he rehabilitation of Atlantic City as a tourist and resort center was a fundamental if not the primary objective of the sponsors of the Casino Amendment and the Casino Control Act, *even though* the constitutional dedication of the proceeds of the tax on casino wagering for the benefit of senior and disabled citizens was a crucial element of the Amendment and the *primary* inducement used to solicit voter approval of the Amendment.

[*Ante* at 521, 734 *A.*2d at 1171–72 (emphasis added).]

In 1977, the public understood that State revenues derived from casinos were to be used solely for senior citizens and the disabled. For example, at a legislative hearing on the CCA, Mrs. Charles Fischer, an advocate for the Atlantic City Performing Arts Center, now the Stockton Performing Arts Center, stated:

> I propose that upon investigation, perhaps some kind of fee or tax can be created which would supply a source of funds, which would be able to amortize the bonding of the [performing arts] center. Now, for example, there might be a resort tax levied as 1% of the payroll of non-gambling operations.... I believe that the revenues from gambling—the use of that—would be prohibited. It is unconstitutional. So, the source would have to come—the source of funds—from something that would benefit from the gambling indirectly. In other words, those funds would be created by gambling but not be direct gambling revenue.

[*Public Hearing on S1780* (Mar. 2, 1977) (statement of Mrs. Charles Fischer).]

Senator McGahn recognized that at some time, casinos might be obligated to contribute to Atlantic City's recovery. He also recognized, however, that the source of the contribution could not be casino revenues:

> Should the casinos, once they have reached maximization, as far as operation is concerned, be responsible to some degree for paying for basically the cost of benefits and improvements as far as the city is concerned[?] I think that is a reasonable concept and a reasonable assumption and certainly when it gets to that particular point, some revenues that would not be taken from the gross revenue or the gross pay that is dedicated to senior citizens could be considered, or as it is in

Vegas at the present time, where the sales tax goes to the convention bureau and the revenues from slot machines go for education.

[*Id.* (statement of Senator McGahn).]

### III.

To fulfill the promise made to obtain the public approval of casino gambling in Atlantic City, the CCA set the tax on casinos' gross revenues at the annual rate of 8%, with all revenues to be used for the benefit of senior citizens and disabled residents. The proceeds of the tax were to be paid to a dedicated account known as the Casino Revenue Fund (CRF). As explained by Assemblyman Steven Perskie, 8% seemed like a "realistic figure" given the need to balance a requirement by the intended recipients of substantial sums with the higher overall tax structure in New Jersey versus Nevada. *Public Hearing on A2366* (Dec. 15, 1976) (CCA) (statement of Assemblyman Perskie). Nothing in the constitutional Amendment or its history intimated that the seniors were due just 8% of the gambling take and that the State was free to use for other purposes any amount it collected beyond 8%. As Assemblyman Kupperman explained when introducing the resolution proposing the Casino Amendment:

[T]he senior citizens and disabled persons will get the benefit, and this money will not be in a general fund, but will be specifically used for this purpose, and as such, *whatever money is raised, whether it be $5 million or $10 million or $20 million or $50 million,* it will have a definite impact on these areas.

[*Public Hearing on ACR 126* (Apr. 14, 1976) (statement of Assemblyman Kupperman) (emphasis added).]

In brief, the State's commitment to use the revenues from casino gambling extended beyond its promise to the recipients that they would receive the funds. The promise extended to the general public.

To stimulate casino investment in Atlantic City, the CCA required casinos with gross revenues in excess of the value of their cumulative investment in the State to invest 2% of their gross revenues in improved real estate. In the alternative, the casinos could pay the required 2% as a tax. Significantly, if remitted as a tax, the proceeds were to be paid to the CRF and dedicated to the seniors and disabled. *N.J.S.A.* 5:12–144(b), (e). The effective

date of this provision was delayed for five years; as a practical matter, it never took effect.

Frustrated at the slow pace of Atlantic City's economic recovery and at its inability to persuade the casinos to make sufficient voluntary investments in Atlantic City, the Legislature in 1984 enacted the CRA. The CRA's investment requirements supplanted the 2% excess-profit assessment of the CCA. Under the CRA, casinos must either invest 1.25% of their gross revenues in Casino Reinvestment Development Authority (CRDA) bonds or in investments approved by the CRDA, or pay 2.5% of their gross revenues as a tax. If the casinos elect to pay the tax, the revenues are paid to the CRF and used for the constitutionally approved purposes of aid to senior citizens and disabled residents. In contrast, the proceeds from the sale of CRDA bonds are spent on a variety of projects throughout the State.

Those projects include a "Miss America Rosewalk, a 20–foot–wide sidewalk lined with dozens of rose lights and with bronze plaques for every Miss America through the year 2000," as well as minor league baseball stadiums, theaters, performing arts centers, improvements to streets leading to casinos, and, the project that produced this appeal, a tunnel leading to another casino. Mary Jo Patterson et al., *CRDA Rolls the Dice—Casinos Cash In: Atlantic City Shell Game,* Star–Ledger, May 4, 1997, at 1. In 1998, CRDA funding provided more than $341 million for new construction, urban renewal, transportation networks, and cultural projects within Atlantic City. Of that amount, over $127 million was used for the expansion of the casinos' own facilities. 1998 funding also included more than $3.5 million for projects in South Jersey outside of Atlantic City and more than $20 million for projects in North Jersey. Casino Reinvestment Development Authority, *Financial Statements & Supplemental Information with Report of Independent Auditors* 21–23 (1999) (1998 Annual Report).

## IV.

To circumvent the Casino Amendment, the majority characterizes the proceeds from the sale of CRDA bonds as something other

than revenues. Until today, the judiciary interpreted the term "revenue" in the 1977 constitutional Amendment broadly. *See Matthews v. State,* 187 *N.J.Super.,* 1, 7–8, 453 A.2d 543 (App.Div.), *appeal dismissed,* 93 *N.J.* 298, 460 A.2d 694 (1983). *Matthews* held that the State could not use the interest on the 8% gambling revenue tax, earned while the CRF funds were held in the State Treasury, for projects unrelated to senior citizens and disabled residents. In so holding, the Appellate Division interpreted "State," "revenues," and "derived" to determine that the interest could be spent for only dedicated purposes. The resolution of that case supports the proposition that the State's constitutional obligation to senior citizens and the disabled is not limited to 8% of casino revenues. Significantly, interest earned on the 1.25% of casino gross revenues deposited quarterly with the Treasury does go to the CRF and is spent for dedicated purposes despite the fact that the principal is used to buy CRDA bonds.

Under the *Matthews* interpretation, the bond proceeds are revenue within the meaning of the constitutional Amendment. To hold, as the majority does, that the proceeds from the purchase of bonds do not constitute State revenue is to deny reality. The CRDA is a State agency. Like tax revenues, the proceeds from the sale of CRDA bonds are paid into the State Treasury, and the State decides how the money is spent. The casinos must pay the tax or buy the bonds. If they do not buy the bonds, they must pay the State twice as much in tax. That the casinos always choose the alternative that costs the least does not make the choice any less compulsory.

The majority admits that the State neither expected nor intended that any casino would pay a 2.5% tax in lieu of making a 1.25% CRDA bond "investment": "Obviously, all casinos have elected to invest annually 1.25 percent of their 'take,' and none have elected to pay the alternative 2.5 percent tax." *Ante* at 532, 734 A.2d at 1178. Curiously, the majority adds: "In that context [that the State never intended to collect the tax], we find highly theoretical the assertion that the 1.25 percent investment alternative improp-

erly diverted funds dedicated + by the Casino Amendment when, in reality, the Legislature never intended to collect additional revenue from the tax on casino winnings." *Ibid.*

The original CCA requirement that the casinos invest 2% of excess profits in real estate mandated "coerced payments," but not "State revenues." Under the CCA, the casinos, not the Casino Control Commission, made the investment decisions. The casinos were not required to pay the money to the State Treasury; the money never came under State control.

Under the Casino Amendment, funds dedicated for senior citizens and disabled residents are limited to State revenues derived from the "establishment and operation of gambling establishments." Like the majority, *ante* at 524, 734 *A.*2d at 1173, we conclude that taxes unrelated to casinos as casinos, for example corporate business, property, and sales taxes, do not constitute State revenues from gambling operations within the meaning of the Amendment. We do not agree, however, that excluding corporate and sales tax revenue from the purview of the Casino Amendment suggests that the Amendment is ambiguous. Corporate and sales taxes are not taxes on the "establishment and operation of gambling establishments." They are not taxes on gambling and they are not peculiar to gambling establishments. By contrast, the 2.5% tax imposed by the CRA, and its alter ego, the 1.25% paid for CRDA bonds, derive from the establishment and operation of casinos.

We also agree with the majority that the $1.50 per day charge that casinos must pay to CRDA for each vehicle parked in a casino-operated parking facility does not produce revenue that must be dedicated. *Ante* at 539–40, 734 *A.*2d at 1182. As the majority explains, the parking fees do not derive from the operation of an "establishment," "casino hotel," or "casino hotel facility," as those terms are defined in *N.J.S.A.* 5:12–19. *See Garden State Racing Ass'n v. Cherry Hill Township,* 42 *N.J.* 454, 201 *A.*2d 554

(1964) (holding that parking lots are not part of racetracks for purpose of statute exempting racetracks from municipal taxation).

## V.

Ten years after adoption of the CCA, the State Commission of Investigation recognized the Legislature's temptation to break faith with the public on the casino revenue issue:

> The Commission wishes at this point to stress the necessity of properly programming one particularly important economic issue—the casino gambling proposal's required distribution of casino tax revenues to ease the utility, property tax and rental costs of the elderly and disabled. Unless the industry wishes to stand accused of being spawned by a hoax, even as it tries to shape a reputable image, this casino referendum "campaign promise" to some one million people must certainly be fairly and adequately implemented.
>
> [SCI, *Report and Recommendations on Casino Gambling by the Commission of Investigation of the State of New Jersey* at II, III (2d prtg. Aug. 1987).]

Perhaps the State should not have promised to use the revenues from casino gambling for the benefit of senior citizens and disabled residents. Maybe another promise would have made better public policy. Doubtless, the State has received greater revenues than it anticipated in 1976. Some might say that senior citizens and the disabled do not need all that money. Such an assertion, however, is belied by the fact that the dedicated tax proceeds, which go into the CRF, currently are insufficient to support the programs that were supposed to be sustained by gambling revenues. Those programs now are being funded from the State's general operating budget. New Jersey's fiscal year 2000 budget reveals:

> Total Casino Revenue Fund revenues of $329.6 [million] are projected for fiscal 2000. It is estimated that appropriations will exceed available revenues by $317.9 million in fiscal 2000. Because programs supported by the Casino Revenue Fund have grown considerably faster than revenues, the General Fund has had to subsidize program spending.... For example, ... due to the insufficient resources of the Casino Revenue Fund, the Senior Citizens Property Tax Freeze appropriation of $23.7 million is being financed by the Property Tax Relief Fund.
>
> [*New Jersey FY 2000 Budget Proposal,* (Jan. 25, 1999) Casino Revenue Fund, Overview.]

If the Legislature wishes to divert revenues to purposes other than those benefiting senior citizens and disabled residents, it

should do again what it did in 1976; submit a referendum to the public.

Another possible alternative is legislative in nature. The Legislature could allow a deduction from "gross revenues," as defined by the CCA, *N.J.S.A.* 5:12–24, for State capital improvement investments. Policy-based income exclusions, tax exemptions, and tax deductions are appropriate tools for government to use in encouraging socially desirable behavior. "By allowing deductions ... for certain activities, or by granting a specific statutory exclusion to gross income, [the legislature] is able to encourage certain activities and discourage others." Christopher W. Schoen, *The Family Savings Account: A Practical Tax Incentive To Stimulate Personal Savings Rates*, 4 *Hofstra Prop. L.J.* 103, 106 (1991).

The Casino Amendment promised only that revenue would be dedicated to specific purposes; it did not promise to collect a certain percentage of the casinos' gross revenues. Accordingly, the Legislature may amend the CCA to allow the casinos to take deductions from gross revenues prior to calculating the amount of tax due.

Tax policy can serve and augment other governmental policies. For example, public policy goals are effectuated through the definition of "gross income" in the Gross Income Tax Act. Compensation for injuries or sickness and scholarship and grant money are excluded from gross income. *N.J.S.A.* 54A:6–6, 6–8. Also excluded is the interest on obligations issued by the State or its subdivisions, *N.J.S.A.* 54A:6–14. Exemptions and deductions from gross income also are utilized to advance policy goals. For example, an exemption from gross income is allowed for some dependents under the age of twenty-two. *N.J.S.A.* 54A:3–1.1. A deduction is allowed for qualifying medical expenses. *N.J.S.A.* 54A:3–3.

The Legislature could similarly encourage the policy objective of investment in capital improvement projects by making the cost of

those investments deductible. The Legislature already has carved some exclusions from the definition of casinos' "gross revenues":

> For the purpose of calculating the tax, gross revenues are defined by *N.J.S.A.* 5:12–24 to include all receipts from gaming operations, including uncollected checks, less only two items. One is a deduction for uncollectible gaming receivables. The other deduction .. is "the total of all sums paid out as winnings to patrons."
>
> [*In re Resolution of the N.J. Casino Control Comm'n*, 262 *N.J.Super.* 572, 575, 621 *A.*2d 536 (App.Div.1993).]

The suggested approach provides an incentive for casinos to invest in capital development but does not constitute an unconstitutional supplanting of a tax with a tax credit. This suggestion merely illustrates the availability of legitimate ways to create incentives for community investment in Atlantic City.

## VI.

The most disturbing feature of the CRA is that it breaks faith with the people of New Jersey. Great states, like great people, should keep their word. *Federal Power Comm'n v. Tuscarora Indian Nation*, 362 *U.S.* 99, 142, 80 *S.Ct.* 543, 567, 4 *L. Ed.*2d 584, 611 (1960) (Black, J., dissenting). By diverting revenues from senior citizens and disabled residents, the State has broken its promise to them and to the general public.

One might question the amount of fuss about a statutory scheme, such as the CRA. After all, the CRA spreads a lot of money around the State. The point, however, is not whether the CRA represents an acceptable public policy or a better one than that submitted to the people in 1976. Rather, the point is that the CRA breaks the promise that the State made to the people of New Jersey in 1976. That promise embodied a moral imperative, not a commitment to be honored only when convenient.

*For affirmance*—Chief Justice PORITZ and Justices O'HERN, GARABALDI, STEIN and COLEMAN—5.

*For reversal*—Justices HANDLER and POLLOCK—2.